UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 5-11806 RWZ

JODY REILLY,
        Plaintiff

V.
THOMAS ROBBINS, as Colonel
of the Massachusetts State Police
        Defendant

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS COUNT IV OF THE AMENDED COMPLAINT

Jody Reilly ("Reilly"), a Massachusetts state trooper, has brought this action pursuant

to 42 U.S.C. §20000e and G.L. c. 151B. The named Defendant is Thomas Robbins, in his

official capacity as Colonel of the Massachusetts State Police (MSP). Since a suit against a

public official in his official capacity is a suit against the governmental entity itself, Wood v.

Hancock County Sheriff's Dep't, 354 F.3d 57, 58 n. 1 (1st Cir. 2003), this action is against

the MSP.

The MSP moves to dismiss Count IV in which Reilly alleges retaliation in violation

of M.G.L. c. 151B, §§4(4), (4A) and (5). This claim is precluded by Plaintiff's prior

whistleblower action in state court that arises from the same set of purportedly retaliatory

actions.

### PERTINENT FACTS

For the purposes of this motion, the alleged facts and all reasonable inferences to be

drawn therefrom are presumed as true. Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st

Cir. 1988).

The facts are as follows. Reilly is a Massachusetts State Trooper[1]. She began her employment with the MSP on June 7, 1993. Amended Complaint ¶10. In March 2000, the MSP assigned Reilly to its Air Wing as a Tactical Flight Officer. Amended Complaint ¶¶14-15. Approximately six months after this assignment, Reilly was promoted to Lead Tactical Flight Officer. Amended Complaint ¶16. The following year, the MSP selected Reilly for helicopter pilot training. Amended Complaint ¶17.

Reilly earned and received a commercial helicopter pilot license from the Federal Aviation Administration (FAA). Amended Complaint ¶18. She earned this license through training sponsored by the MSP. Amended Complaint ¶19, thereby becoming the first female helicopter pilot employed by the MSP. Amended Complaint ¶21. Reilly also received an instrument rating from the FAA on January 16, 2002. Amended Complaint ¶22. Ten months later, the MSP "released" Reilly as a "probational aircraft commander." Amended Complaint ¶24.

On May 7, 2003, Reilly sent a written complaint to Lt. Michael Barry and the MSP's Harassment Investigation Unit alleging that she had been sexually harassed during training on April 29, 2003. Amended Complaint ¶33. Reilly alleged that Trooper Tim Riley made an offensive comment during a pool training exercise, likening some training equipment to a male's genitals. Amended Complaint ¶32.

On January 12, 2004, Reilly filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission against the MSP, its Chief Legal Counsel, its former Deputy Superintendent, as

---

[1] While she does not self-identify as such in this action, Reilly is a Massachusetts State Trooper. See paragraph 1 of the state court complaint attached as Exhibit 1.

well as her immediate supervisor. Amended Complaint ¶39. She alleged gender discrimination, sexual harassment, and retaliation. Id.

Reilly alleges that the MSP subjected her to several purportedly adverse employment actions in the form of retaliation and disparate treatment because of her gender. Amended Complaint ¶25. The "Retaliation" portion of the "Facts" section of the Amended Complaint encompasses approximately seven pages. Amended Complaint, pp. 16-24. The alleged retaliatory actions included a hostile work environment. Amended Complaint ¶43(o). According to Reilly, the MSP "engaged in a campaign of retaliation" against her in response to her complaints of sexual harassment and gender discrimination. Amended Complaint ¶43. This campaign included an unwarranted investigation of her personal life and pilot training, Amended Complaint ¶43(a); a refusal to respond to her report of threats and insults from Lieutenant Barry's wife, ¶43(d); a co-worker's circulation of her MCAD complaint to MSP personnel, ¶43(g); the investigation of her statements during interviews with the MSP's Harassment Investigation Unit and of the truthfulness of entries in her flight logbook, and the announcement of a prospective eighteen month suspension and bar from returning to the Air Wing, ¶43(n).

## WHISTLEBLOWER CLAIM PENDING IN STATE COURT

Reilly is a named plaintiff in Gura et al. v. Thomas Foley, as Colonel of the Commonwealth of Massachusetts Department of the State Police, No. MICV2004-01654 ("the state case"), currently pending in the Superior Court Department, Middlesex County, Massachusetts. A true copy of the complaint in the state case is attached as Exhibit 1.

Reilly claims in the state case that her transfer out of the Air Wing division was retaliatory in violation of the Massachusetts Whistleblower Statute, G.L.c 149 §185. She states, in relevant part:

3

> 9.      In May 2003, Reilly filed a letter of complaint with the
> State Police Harassment/Sexual Harassment Unit.  She alleged
> that she had been subjected to unwarranted sexual advances by
> the unit commander, discriminated against based upon her
> gender, and subjected to a hostile work environment as a
> matter of law.
> 10.      In or about January 2004, Reilly filed a complaint with
> the Massachusetts Commission Against Discrimination, which
> is currently pending (Docket Number 04BEM00100).  Details
> of her complaint were described in a newspaper article
> appearing in the <u>Boston Globe</u> on January 20, 2004.

***

> 26.      Plaintiff Jody Reilly provided testimony regarding a
> violation of law by Defendant's employee, to the employer, and
> to the MCAD.
> 27.      The Defendant transferred Plaintiff Reilly in retaliation
> for her ongoing litigation.

## ARGUMENT

## SINCE SHE FILED A WHISTLEBLOWER ACTION IN STATE COURT, REILLY WAIVED HER RIGHT TO CLAIM RETALIATION PURSUANT TO MASSACHUSETTS STATE LAW

In Count IV, Reilly claims that the MSP retaliated against her for opposing practices

that are unlawful employment practices under the Massachusetts Anti-Discrimination

Statute, M.G.L. c. 151B.  Amended Complaint ¶¶65-70.  However, she is precluded form

making this claim by her prior action in state court.  Her state action was brought pursuant

to the Massachusetts Whistleblower statute, M.G.L. c. 149 §185.  The Whistleblower

statute unambiguously states that:

> (f)      Nothing in this section shall be deemed to diminish the rights,
> privilege or remedies of any employee under any other federal or state law or
> regulation, or under any collective bargaining agreement or employment
> contract, <u>except that the institution of a private action in accordance with
> subsection (d) shall be deemed a waiver by the plaintiff of the rights and
> remedies available to him, for the actions of the employer, under any other
> contract, collective bargaining agreement, state law, rule or regulation, or
> under the common law.</u>

G.L. c.149, §185. (emphasis added).

4

Although the only Massachusetts appellate court to address this waiver provision did so only indirectly, Service v. Newburyport Housing Authority, 63 Mass.App.Ct. 278,280 (2005) (plaintiff "opted not to pursue her rights pursuant to G.L. c. 31, §§41-45, and instead filed this action pursuant to G.L.c. 149, §185(d) and (f)."), decisions of the Massachusetts Superior Court and the United States District Court have explicitly held that "in enacting this waiver provision, the Legislature intended to prevent an employee from receiving a duplicative or cumulative recovery based on a public employer's retaliatory action."  Joyce v. GF/Pilgrim, Inc., 17 Mass.L.Rptr.13 (September 30, 2003) (Hinkle, J.). A copy of this case is attached as Exhibit 2.

In Haddad v. Scanlon, 1999 Mass.Super.LEXIS 272 at *9-*10, 10 Mass.L.Rptr. 298 (July 16, 1999)(Welch, J.), the court found that "a state employee who institutes an action under G.L. c. 149 §185(d) waives all rights and remedies arising out of the retaliatory action, but does not waive claims that are substantially separate from an independent cause of action to recover for the retaliatory conduct." Id. A copy of this case is attached as Exhibit 3. The Court in City of Everett v. International Brotherhood of Police Officers, Local 633, 16 Mass.L.Rptr.126, 2003 WL 1699353 (Mass.Super.). *3 (Brassard, J.) held that when the plaintiff instituted a private civil action under G.L. c. 149 §185, he waived the rights and remedies under the collective bargaining agreement. A copy of this decision is attached as Exhibit 4.

A number of decisions of the Unlisted States District Court have reached the same conclusion. Putnam v. Town of Saugus, 365 F.Supp. 151, 194 (D.Mass.2005)(Young, C.J.) (citations omitted); Bennet v. City of Holyoke, 230 F.Supp.2d 207, 220-221 9D. Mass. 2002), aff'd 362 F.3d 1 (Ponsor, J.).

The retaliatory conduct alleged in the instant case and in Reilly's state court case against the MSP are not independent causes of action but parts of the same purported campaign of retaliation. They all stem from filing an intern and a subsequent complaint with the MCAD. When Reilly filed the state action under the Whistleblower statute, she waived her rights and remedies arising out of the retaliatory action.

## CONCLUSION

For the above reasons, Count IV of the amended complaint should be dismissed with prejudice.

Respectfully Submitted,

THOMAS ROBBINS, as Colonel
of the Massachusetts State Police

By its attorneys,

THOMAS F. REILLY
ATTORNEY GENERAL

Maite A. Parsi, BBO No. 554009
Assistant Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
617-727-2200 x3322
maite.parsi@ago.state.ma.us

Dated: November 4, 2005

## CERTIFICATE OF SERVICE

I certify that on this 4th day of November 2005, I served the above document on counsel for the plaintiff, Scott Lang and Gigi Tierney, Lang, Xifaras & Bulard, 115 Orchard Street, New Bedford, MA 02740 by regular mail, postage prepaid.

Maite A. Parsi

1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.



JOSEPH GURA, GALE MACAULAY,
JODY REILLY, and SHAWN CAMPINHA,
    Plaintiffs

V.

THOMAS FOLEY, as Colonel of the
Commonwealth of Massachusetts
DEPARTMENT OF STATE POLICE,
    Defendants

04-1654

## COMPLAINT AND DEMAND FOR JURY TRIAL

```
04/20/04  10:09#0000  6109 CLERK  E
                                    4@      240.00
                          CIVIL            960.00
                          SURCHARGE         15.00
                          SUMMONS            5.00
                          SECC              20.00
                          041654 #
                          SUBTTL          1000.00
                          TOTAL
                                         1000.00
                          CHECK          1000.00
```

### INTRODUCTION

1.    This action is brought on behalf of four State Police Troopers who have suffered adverse employment action as a result of their protected action as "whistleblowers".

### PARTIES

2.    Joseph Gura is an individual residing in Hampshire County, Massachusetts.

3.    Gale MacAulay is an individual residing in Plymouth County, Massachusetts.

4.    Jody Reilly is an individual residing in Barnstable County, Massachusetts.

5.    Shawn Campinha is an individual residing in Plymouth County, Massachusetts.

6.    The Department of State Police is an agency of the Commonwealth of Massachusetts established by Mass. G.L. ch. 22c.

### JURISDICTION

7.    This Court has jurisdiction over this matter in accordance with M.G.L. ch. 149, § 185.

## FACTS

8.    Prior to February 29, 2004, Plaintiff's Joseph Gura ("Gura"), Gale MacAulay ("MacAulay"), Jody Reilly ("Reilly") and Shawn Campinha ("Campinha") were assigned to the State Police Air Wing ("Air Wing"). MacAulay and Reilly are the only female members of the State Police Air Wing.

9.    In May 2003, Reilly filed a letter of complaint with the State Police Harassment/Sexual Harassment Unit. She alleged that she had been subjected to unwarranted sexual advances by the unit commander, discriminated against based upon her gender, and subjected to a hostile work environment in violation of law.

10.    In or about January 2004, Reilly filed a complaint with the Massachusetts Commission Against Discrimination, which is currently pending (Docket Number 04BEM00100). Details of her complaint were described in a newspaper article appearing in the Boston Globe on January 20, 2004.

11.    On November 18, 2003, Campinha and MacAulay flew a helicopter mission that involved flying Boston Police photographers over the City of Boston.

12.    On November 20, 2003, Campinha and MacAulay were informed that they were being investigated for an alleged unsafe helicopter landing procedure, during the November 18, 2003 mission, and were requested to submit a report.

13.    MacAulay and Campinha submitted reports on November 24, 2003. After submitting their reports, they were informed that they were "grounded" (prohibited from flying) until further notice.

14.    Campinha and MacAulay appealed this order in accordance with M.G.L. ch. 22c, § 43, which provides an administrative appeal for any department member aggrieved by an order of the Colonel or his designee.

15.    On December 11, 2003, the § 43 appeal hearing was conducted by Lieutenant Colonel John Caulfield. Campinha and MacAulay testified that their landing procedure was appropriate and not unsafe. They further testified that several other members of the Air Wing had performed unsafe maneuvers, and had not been "grounded" or re-trained. These other incidents included officers flying too low causing a woman to fall off a horse, landing too closely to a baby carriage that was blown away, and another officer causing damage to an aircraft.

16.    Testifying on behalf of Campinha and MacAulay were Joseph Gura, who was their union "Barracks" representative, and Sergeant Chuck Atchison, another member of the Air Wing.

17.    Gura and Atchison confirmed Campinha and MacAulay's assertion that there existed serious safety concerns with some members and practices within the Air Wing.

18. On December 12, 2004, the day after the § 43 hearing, the Defendant transferred Captain Michael Concannon ("Concannon") to the Air Wing as the new unit commander. Campinha and MacAulay's § 43 appeal was denied, and they sought further appellate review in Superior Court which remains pending (Suffolk Superior Court, Civil Action No. 04-0648H).

19. Concannon was informed the Air Wing had some "on-going issues" that needed to be resolved to ensure that the aircraft and missions would be conducted safely.

20 To achieve this, Concannon "informally" interviewed all members of the Air Wing, and compiled a report and recommendations.

21. This report, dated February 29, 2004, purportedly summaries opinions and quotes from unidentified members of the Air Wing.

22. Concannon's final recommendation was to remove from the Air Wing those officers that had pending legal matters with the Department (Reilly, Campinha, MacAulay) and those that testified on their behalf (Gura, Atchison).

23. Defendant Foley adopted this recommendation, and unilaterally transferred these officers from the Air Wing.

COUNT 1 – M.G.L. CH. 149, § 185 (JODY REILLY)

24. Reallege and incorporate paragraph 1 through 23 above.

25. M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

26. Plaintiff Jody Reilly provided testimony regarding a violation of law by Defendant's employee, to the employer, and to the MCAD.

27. The Defendant transferred Plaintiff Reilly in retaliation for her ongoing litigation.

COUNT II - M.G.L. CH. 149, § 185 (SHAWN CAMPINHA)

28. Reallege and incorporate paragraph 1 through 27 above.

29. M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

30. Plaintiff Campinha provided testimony regarding policies of the Air Wing that he believes pose a risk to public health and safety.

31.    The Defendant transferred Plaintiff Campinha in retaliation for his testimony and ongoing litigation.

## COUNT III - M.G.L. CH. 149, § 185 (GALE MACAULAY)

32.    Reallege and incorporate paragraph 1 through 31 above.

33.    M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

34.    Plaintiff MacAulay provided testimony regarding policies of the Air Wing that she believes pose a risk to public health and safety.

35.    The Defendant transferred Plaintiff MacAulay in retaliation for her testimony and ongoing litigation.

## COUNT IV - M.G.L. CH. 149, § 185 (JOSEPH GURA)

36.    Reallege and incorporate paragraph 1 through 35 above.

37.    M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

38.    Plaintiff Gura provided testimony regarding policies of the Air Wing that he believes pose a risk to public health and safety.

39.    The Defendant transferred Plaintiff Gura in retaliation for his testimony and ongoing litigation.

WHEREFORE, Plaintiffs pray that judgment be entered on their behalf, and further that:

1.    Defendant reinstate Plaintiffs to the State Police Air Wing;
2.    The Defendant compensate Plaintiffs for three time lost wages and other damages, together with interest thereon;
3.    The Defendant be ordered to pay Plaintiffs costs and legal fees associated with this action; and
4.    Such other relief as the Court deems necessary and proper.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL TRIABLE COUNTS.

.

**2**

# Westlaw.

Not Reported in N.E.2d     Page 1

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

(Cite as: 2003 WL 22481100 (Mass.Super.))

Superior Court of Massachusetts.
Diane T. JOYCE,
v.
GF/PILGRIM, INC. d/b/a The Guardian Center.
No. 020517B.

Sept. 30, 2003.

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S PARTIAL MOTION TO
DISMISS, OR
IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT ON COUNTS II, III AND IV OF
THE
VERIFIED COMPLAINT.

MARGARET R. HINKLE, Justice.

\*1 Plaintiff Diane Joyce filed this action against her former employer, GF/Pilgrim, Inc. d/b/a The Guardian Center, alleging that she was terminated in retaliation for complaining about admission practices at the nursing home where she was employed as the Director of Nursing. This matter is before the court on defendant's partial motion to dismiss Counts II, III and IV of the verified complaint under Mass.R.Civ.P. 12(b)(6) for failure to state a claim or, in the alternative, for summary judgment under Mass.R.Civ.P. 56. For the reasons discussed below, after a hearing, summary judgment is *allowed* as to Counts II, III and IV of the complaint.

## BACKGROUND

The following is taken from the summary judgment record. The undisputed facts, and any disputed facts viewed in the light most favorable to the non-moving party, are as follows. GF/Pilgrim is the owner and operator of a long-term care facility, commonly referred to as a nursing home, in Brockton, Massachusetts ("the Center"). In June of 1997, defendant hired plaintiff, a registered nurse, to be the Center's Director of Nursing. Plaintiff did

not have a written employment contract with the Center. Plaintiff's duties as Director of Nursing included patient care; management of the nursing staff, including scheduling and training; policy review, documentation audits; local, state and federal compliance review; and the management of internal quality programs.

On February 22, 2001, plaintiff signed an "Employee Acknowledgment Form" to acknowledge that she had received a copy of the Center's "Human Resource Policy Book" ("the Handbook"). The Acknowledgment Form states in relevant part:

I have entered into my employment relationship with The Guardian Center voluntarily and acknowledge that there is no specific length of employment. Since the information, policies and benefits described here are necessarily subject to change, I acknowledge that the Guardian Center may revise the Handbook at any time. Furthermore, I acknowledge that this Handbook is neither a contract of employment nor a legal document. I have received this Handbook, and I understand that it is my responsibility to read and comply with the policies contained in this Handbook and any revisions made to it.

The preface to the Handbook states:

The statements in this Manual are operating guidelines. Flexibility in matters involving employment is critical to responding to the changing needs of the healthcare community, our facility and staff members. We do reserve the right to revise, supplement, discontinue or otherwise reconsider any or all of these policies, practices or employee benefits, with or without notice, at any time we deem it appropriate.

This manual is intended to describe important and useful information about your employment. No portion of the Manual constitutes a contract between you and the facility, or any of its employees, concerning any of the matters described herein.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 2

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

**(Cite as: 2003 WL 22481100 (Mass.Super.))**

**\*2** The Handbook further provides:

All employment and compensation with the Guardian Center is "at will," in that employment can be terminated with or without cause, and with or without notice, at any time, at the option of either the employer, or you the employee, except as otherwise provided by law.

The Handbook contains a section entitled "Progressive Discipline" which explains:

[w]hen a problem arises concerning employee performance, attendance or conduct deemed to be unsatisfactory, or has the potential of becoming unsatisfactory, it will be addressed by the immediate Supervisor according to the following protocol which will be dictated by the nature of the problem and not necessarily sequentially.

The Handbook then lists the following disciplinary options with brief descriptions: Employee Counseling, Written Record of an Oral Warning, Written Warning, Final Written Warning, Probation, Suspension and Termination. The Handbook further states in relevant part:

*Termination*--This is the step of last resort, where conduct or performance has simply not improved to an acceptable level, or when an employee commits an offense of such serious nature as to warrant immediate discharge ...

Situations which can be cause for immediate discharge without advance warning include, but are not limited to the following:

Refusal or intentional failure to perform reasonable assigned work ...

Insubordination, willful or gross misconduct ...

Violation of safety rules ...

EMPLOYMENT AT WILL

The Guardian Center has developed this Human Resource policy book in an effort to provide fair, equitable and consistent treatment of employees. However, all employees are hired as "employees at will." This means that neither the employee nor the employer is bound by any contract--the employee may quit when s/he desires to, and likewise, the employer may terminate the employee at its discretion when it is deemed appropriate to do so.

In September of 2001, plaintiff verbally and in writing reported certain concerns about the Center's patient admission practices to her direct supervisor, Jennifer Conley, the Administrator of the Center. Plaintiff informed Conley that Marie Albert, the Center's Admissions Coordinator, was failing to obtain written patient consents to admission, treatment and medication from patients or their authorized representatives at the time of admission to the Center, in breach of 105 Code Mass.Regs. § 150.003. [FN1] In addition, plaintiff informed Conley that Albert was forging patient consents, backdating patient consent, and instructing the nursing staff to forge patient consents. Plaintiff opined that the treatment and medication of patients without written consents posed a risk to the patients' health and safety and a risk to the professional licenses held by the Center and its staff. She also opined that billing federal and state entities such as Medicare for patients who were being treated without consent constituted fraud because such patients technically were not admitted to the Center. Conley believed that plaintiff's complaints were prompted by her dislike for Albert. [FN2]

> FN1. That regulation provides: "No facility shall admit a patient or resident without written consent of the individual (if she/he is competent to enter into such an agreement) or her/his parent or legal guardian (if she/he is not) except in emergencies." 105 Code Mass.Regs. § 150.003(B)(2).

> FN2. At deposition, plaintiff admitted that she hated Albert and that she and Albert had "screaming matches" over various personal and professional disagreements.

**\*3** On December 18, 2001, plaintiff sent Conley an e-mail which stated in relevant part:

I mentioned to you yesterday that I had no intentions of quitting my job. I should not have to quit since I am simply attempting to relate to you the seriousness of numerous residents who were not legally admitted to the facility. I relayed this to you as my immediate superior and I expected you to follow up. Instead, I am working in an intensely hostile environment [sic] and I fear retaliation and wrongful termination of my job

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

(Cite as: 2003 WL 22481100 (Mass.Super.))

b/c I attempted to correct a wrong ... I told you on 5 separate occasions [sic] ... that Marie had Betty Crowley and Paula Borges sign admission paper work with a check mark where the resident should have signed ... I directed each nurse they are not to obtain any signatures from residents for admission paper work until further notice because they are receiving inaccurate [sic] information and being asked to sign documents which jeopardizes [sic] their licensure, as well as mine and yours. Until [sic] the process is revised and legal, I feel the staff nurses should not be expected to involve themselves [sic] in knowingly illegal activity since they are not knowledgeable [sic] about all the admission regs ...

The following day, plaintiff sent Conley another e-mail which stated in relevant part:

I have contacted an attorney who has advised me to receive a signed confirmation from you that you received my email dated 12/18/01 ... The email on 12/18/01 discussed my complaint to you going back to 9/14/01 ... about Marie Albert asking two nurses to use check marks in the section the resident actually should have signed. Also I reiterated the numerous current and discharged residents who never received the resident rights nor consent to treat and admit. The reason for the confirmation from you is due to my concern about illegal practices taking place and my and the other nurse's complicicity [sic] in the illegal practices. As my superior I want confirmation that you will handle this complaint and I could stop worrying and complaining.

On December 21, 2001, Conley informed plaintiff that she was instituting a new administrative policy requiring the Nursing Department to obtain the necessary written consent from each patient upon admission to the Center. Before this policy, the Admissions Department was responsible for obtaining such consent. Plaintiff strongly disagreed with the new policy, partly because she felt that Albert should not be excused from her duty to obtain consent forms. On December 24, plaintiff sent Conley an e-mail stating in relevant part:

you stated you were now making it policy that the admission consent will be transferred from the Admission Director and now will be the sole responsibility of the nursing department. I ask

you to reconsider this policy *prior* to informing the nurses of this. You suggested that Marie could not be expected to be at work at all hours of the day to admit residents. The required workload for the nurses is overwhelming to expect them to leave at the end of their scheduled shift ... I know you stated other nursing homes have nurses obtaining the admission consent on off shifts however, this is a rarity and I have never seen it done in a single home. There again, I have never seen the admission process problematic in any home I have ever worked in. It is unrealistic to ask the nurses to perform another task and assume another duty just because the current process is flawed ...

*4 If you need additional verification that the nurse's workload is already excessive and unsafe I ask that you join them for a 7-3 shift and 3-11 shift. (Different days of course). Simply observe what takes place on an average shift *without* the additional responsibility of an admission and I believe you will be shocked ...

You asked me last week what I consider to be harassment? I feel your change in policy to now have the nurses obtain the consents from residents is pay back, and retaliation to my complaint ...

On December 28, 2001, plaintiff sent a written memo to the nursing staff telling them not to treat any patients unless there was a written consent form but did not mention that the policy was going to change to require nurses to obtain the consents.

On January 2, 2002, plaintiff reported what she believed were improper admissions practices to Eleanor Robinson, the Center's Compliance Officer. On January 7, plaintiff notified Conley in writing that she had been receiving telephone "hang up" calls which she suspected were being made from Center telephones and that she was concerned for her safety. The same day, Conley terminated plaintiff's employment due to insubordination. In her deposition, Conley explained that there was a history of personality conflict between plaintiff and Albert and that she believed that plaintiff's complaints concerning admissions practices were an attempt to get Albert fired. Conley further believed that plaintiff's conduct was dividing the nursing staff and creating conflict in the work environment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 4

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

## (Cite as: 2003 WL 22481100 (Mass.Super.))

and that plaintiff was insubordinate in instructing the nurses not to comply with the new admissions policy.

Thereafter, on January 31, 2002, plaintiff filed this action. Count I of the complaint alleges violation of the "healthcare whistle-blower" statute, G.L.c. 149, § 187; Count II alleges termination of employment in violation of public policy; Count III alleges breach of the implied covenant of good faith and fair dealing; and Count IV alleges breach of implied contract.

### DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); *Cassesso v. Commissioner of Correction*, 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991).

I. Preemptive Effect of Whistleblower Statute

*5 Defendant initially first moves for summary judgment on Counts II, III and IV of the complaint on the ground that the healthcare whistle-blower statute, G.L. 149, § 187 ("the Act"), preempts all common-law claims. The Act provides in relevant part:

(b) A health care facility [FN3] shall not refuse to hire, terminate a contractual agreement with or take any retaliatory action against a health care provider [FN4] because the health care provider does any of the following:

FN3. The statutory definition of "health care facility" includes nursing homes. See G.L.c. 149, § 187(a) (1999).

FN4. The statutory definition of "health care provider" includes a registered nurse. See G.L.c. 149, § 187(a) (1999).

(1) discloses or threatens to disclose to a manager or to a public body an activity, policy or practice of the health care facility ... that the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health;

...

(3) objects to or refuses to participate in any activity, policy or practice of the health care facility ... which the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health ...

G.L.c. 149, § 187(b) (1999). The Act then provides health care providers with a cause of action as follows:

(d) Any health care provider or former health care provider aggrieved by a violation of this section may, within two years, institute a civil action in the superior court. Any party to such action shall be entitled to claim a jury trial. All remedies available in common-law tort actions shall be available to prevailing plaintiffs. The remedies shall be in addition to any legal or equitable relief provided herein. The court may:

(1) issue a temporary restraining order or preliminary or permanent injunction to restrain continued violation of this section;

(2) reinstate the health care provider to the same position held before the retaliatory action, or to an equivalent position;

(3) reinstate full fringe benefits and seniority rights to the health care provider;

(4) compensate the health care provider for lost wages, benefits and other remuneration, and interest thereon; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

**(Cite as: 2003 WL 22481100 (Mass.Super.))**

(5) order payment by the health care facility of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys fees ...

Finally, the Act provides:

(g) Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any health care provider under any other federal or · state law or regulation or under any collective bargaining agreement or employment contract. G.L.c. 149, § 187(g) (1999).

Plaintiff contends that although § 187(g) preserves any additional statutory, regulatory or contract claims a health care provider may have against an employer, its silence as to the preservation of common-law claims dictates that such claims are preempted. Plaintiff relies on the maxim of statutory construction that the expression of one thing is the exclusion of the other. See *Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615, 620 (1997); *Collatus v. Boston Retirement Bd.*, 396 Mass. 684, 687 (1986). The language of § 187(g) cited by plaintiff is identical to language contained in the public employee whistle-blower statute, G.L.c. 149, § 185. However, Section 185(f) of the public employee statute expressly provides:

\*6 Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any employee under any other federal or state law or regulation or under any collective bargaining agreement or employment contract; *except that the institution of a private action in accordance with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law.*

G.L.c. 149, § 185(f) (1997) (emphasis added). In enacting this waiver provision, the Legislature intended to prevent an employee from receiving a duplicative or cumulative recovery based on a public employer's retaliatory action. *Haddad v. Scanlon*, 1999 Mass.Super. LEXIS 272 at \*9, 10 Mass. L. Rptr. 298 (July 16, 1999) (Welch, J.).

In contrast to G.L.c. 149, § 185(f), the Act does not contain a waiver provision or other language

suggesting preemption of common-law remedies. When the Legislature has intended to make a statutory remedy exclusive, it has used very specific language to do so. See, for example, Section 24 of the Workers' Compensation Act, [FN5] Section 9 of the Unlawful Discrimination in Employment Act, [FN6] and Section 2 of the Massachusetts Tort Claims Act. [FN7] See also *Greer v. Wyman-Gordon Co.*, 422 Mass. 551, 557-58 (1996) (employee's common-law claims based on workplace sexual harassment preempted by exclusivity provisions of Section 151B and Chapter 152). Absent a clear indication by the Legislature that it intended the statutory remedy in G.L.c. 149, § 187 to be exclusive, this Court declines to rule that the Act preempts all common-law claims by a health care provider based on retaliatory conduct falling within the scope of the statute.

> FN5. Section 24 of Chapter 152 provides in relevant part: "An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right ..." G.L.c. 152, § 24 (2000).

> FN6. Section 9 of Chapter 151B provides in relevant part: "nothing contained in this chapter shall be deemed to repeal any provision of any other law in this commonwealth relating to discrimination; but, as to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned." G.L.c. 151B, § 9 (2002).

> FN7. Section 2 of Chapter 258 provides in relevant part: "[t]he remedies provided by this chapter shall be exclusive of any other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 6

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

(Cite as: 2003 WL 22481100 (Mass.Super.))

civil action or proceeding by reason of the same subject matter against the public employer or, the public employee or his estate whose negligent or wrongful act or omission while acting within the scope of his office or employment ..." G.L.c. 258, § 2 (2000).

II. Count II: Termination in Violation of Public Policy

Plaintiff contends that even if the statutory remedy in G.L.c. 149, § 187 is not exclusive, plaintiff cannot, as a matter of law, state a common-law claim for termination in violation of public policy. The general rule is that employment at will is terminable by the employer without notice, for almost any reason or for no reason at all. *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 472 (1992); *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 9 (1988). However, an at-will employee has a cause of action for wrongful termination where her termination violates a clearly established public policy, as where she is terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do that which the law forbids. *King v. Driscoll,* 418 Mass. 576, 582 (1994) ; *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. at 472. The rationale for the public policy exception to the traditional rule governing at-will employment is that, unless such a common-law remedy is recognized, there is no other way to vindicate public policy. *Melley v. Gillette Corp.,* 19 Mass.App.Ct, 511, 512 (1985), aff'd, 397 Mass. 1004 (1986). Thus, where a comprehensive remedial statute protects the public policy at issue, a terminated employee does not have a common-law action for termination in violation of that public policy. *Mello v. Stop & Shop Cos.,* 402 Mass. 555, 557 (1988). See, e.g., *Federici v. Mansfield Credit Union,* 399 Mass. 592, 597 (1987) (no common-law claim for termination based on work-related injury where G.L.c. 152, § 75A provides rights and remedy); *Melley v. Gillette Corp.* 19 Mass.App.Ct. at 513 (no common-law claim for age-based termination given existence of Chapter 151B); *Lohnes v. Darwin Partners, Inc.,* 15

Mass. L. Rptr. 157 (July 23, 2002) (Gants, J.) (no common-law claim for termination in retaliation for complaint about failure to pay wages and commissions where G.L.c. 149, § 150 provided remedy).

*7 Here, plaintiff alleges she was terminated because she complained of illegal admission practices at the Center, practices which violated 105 Code Mass.Regs. § 150.003 and threatened the health and safety of nursing home residents. Such a termination clearly falls within the protection of G.L.c. 149, § 187(b) which protects health care providers such as registered nurses against retaliation for "disclos[ing] ... to a manager ... an activity, policy or practice of the health care facility ... that the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law." Because the Act provides a comprehensive remedial scheme to vindicate the public policy of protecting health care workers who report illegal conduct, I find and rule that plaintiff has no common-law claim for termination in violation of that public policy. See *Mello v. Stop & Shop Cos.,* 402 Mass. at 557. Cf. *Hobson v. McLean Hosp. Corp.,* 402 Mass. 413, 416 (1988) (before enactment of G.L.c. 149, § 187, nurse stated claim for termination in violation of public policy where she was fired from hospital for enforcing state and local laws concerning supervision of patients). Thus, defendant is entitled to summary judgment on Count II of the complaint.

III. Count III: Breach of Covenant of Good Faith & Fair Dealing

Defendant further contends that as a matter of law, plaintiff fails to state a claim for breach of the covenant of good faith and fair dealing. In Massachusetts, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract. *Harrison v. NetCentric Corp.,* 433 Mass. 465, 473 (2001). An employer violates the covenant of good faith and fair dealing where it terminates an at-will employee in order to deprive her of commissions or other compensation already earned. *King v. Driscoll,* 424 Mass. 1, 6 (1996);

Not Reported in N.E.2d

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

**(Cite as: 2003 WL 22481100 (Mass.Super.))**

Page 7

*Fortune v. National Cash Register Co.,* 373 Mass. 96, 104-05 (1977). Plaintiff does not argue that her termination falls into this analytical framework.

Other case law suggests that termination of an at-will employee for reasons contrary to a well-defined policy constitutes a breach of the covenant of good faith and fair dealing. See *Fairneny v. Savogran Co.,* 422 Mass. 469, 475 (1996); *Federici v. Mansfield Credit Union,* 399 Mass. at 595. However, a cause of action for breach of the implied covenant exists only when there is no other adequate way to vindicate public policy. *Grubba v. Bay State Abrasives,* 803 F.2d 746, 747 (1st Cir.1986); *Bhawan v. Fallon Clinic, Inc.,* 5 F.Sup.2d 64, 67 (D.Mass.1998). Given the comprehensive remedy set forth in G.L.c. 149, § 187 , I find and rule that plaintiff does not have an action for breach of the implied covenant of good faith and fair dealing based on a violation of public policy. Therefore, defendant is entitled to summary judgment on Count III of the complaint.

IV. Count IV: Breach of Implied Contract

*8 Finally, defendant contends that plaintiff has no reasonable expectation at trial of demonstrating breach of an implied contract. In some circumstances, a personnel manual distributed by an employer to its employees may form the basis of an implied employment contract. *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. 686, 691 (1996) . The central inquiry is whether in light of the context of the manual's preparation and distribution, as well as its specific provisions, it would be objectively reasonable for employees to regard the manual as a legally enforceable commitment concerning terms and conditions of employment. *Weber v. Community Teamwork, Inc.,* 434 Mass. 761, 779 (2001); *Ferguson v. Host International, Inc.,* 53 Mass.App.Ct. 96, 102 (2001).

No specific list of prerequisites determines whether a personnel manual constitutes an implied contract; all relevant facts and circumstances must be considered. *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. at 692. For example, while the fact that the employer and employee negotiated concerning

the terms of a manual justifies a finding of implied contract, negotiation is not an essential precondition to enforcement of a manual. In addition, disclaimer clauses stating that a manual creates no contractual rights or reserving a unilateral right to modify or cancel the manual, while relevant, are not dispositive of whether an employee could reasonably believe that procedures contained therein bind management. *Id.* at 692-93; *Ferguson v. Host International, Inc.,* 53 Mass.App.Ct. at 103. Other relevant factors include whether the manual provides merely general guidance or sets forth employee rights and mandatory responsibilities in great detail; whether the employee signed the manual, manifested assent to it or acknowledged understanding of its terms, and whether the employer called special attention to the manual. *Weber v. Community Teamwork, Inc.,* 434 Mass, at 780; *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. at 693. Also, evidence that management had a practice of adhering to a manual's procedures supports a finding of an implied contract. *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. at 694; *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. at 14.

Here, the summary judgment record reveals that defendant provided the Handbook to plaintiff in February of 2001. By signing it, plaintiff acknowledged its receipt, that she was responsible for complying with its terms, and that it was neither a contract of employment nor a legal document guaranteeing a specific length of employment. Plaintiff apparently complied with the Handbook's procedures in reporting the allegedly improper admissions practices. The preface to the Handbook, its first page, states that the Handbook is not a contract of employment and that plaintiff reserves the right to revise or discontinue the policies, practices and benefits in the Handbook, without notice and at any time.

*9 The fourth page of the Handbook contains a section entitled "At Will Employment" which reiterates that an employee may be terminated without cause and without notice at any time. Overall, the Handbook provides more than general guidance as to policies and contains specific

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 8

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

**(Cite as: 2003 WL 22481100 (Mass.Super.))**

responsibilities expected of employees as well as eligibility for certain benefits. Specifically cited by plaintiff, the Handbook provides for "Progressive Discipline" and states that problems will be addressed by supervisors "according to the following protocol which will be dictated by the nature of the problem and not necessarily sequentially." Immediately following the listing of various options for progressive discipline, the Handbook sets forth situations warranting immediate discharge without warning and then reiterates that all employees are employees at-will who may be terminated at the discretion of plaintiff.

Consideration of all the relevant factors in the summary judgment record reveals that the issue of whether plaintiff meets the *Kourouvacilis* standard on Count IV is a close call. Defendant called attention to the Handbook and required employees to sign an acknowledgment that they would comply with its terms. As noted, the Handbook contains more than general guidance, setting forth specific obligations, benefits and procedures. See *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. at 693-94 (manual binding contract where although it was not negotiated it contained no disclaimer that employer could unilaterally change it or fire employees without cause, it provided more than general guidance as to employer's policies, and employer regularly followed manual's procedures in addressing employee grievances).

Conversely, the Handbook's numerous and prominent disclaimers that it does not provide contractual rights or alter employees' at-will status, as well as the fact that supervisors appear to retain some discretion in implementing the progressive discipline, suggest that it might not be reasonable for employees to view the Handbook's procedures as binding on management. See *Hinchey v. Nynex Corp.,* 144 F.3d 134, 141-42 (1st Cir.1998); *Chilson v. Polo Ralph Lauren Retail Corp.,* 11 F.Sup.2d 153, 157 (D.Mass.1998) (handbook not binding contract where there was no negotiation; employer retained right to modify it unilaterally; handbook in bold print repeatedly emphasized it was not binding contract; handbook stated that employee participation in its procedures was

voluntary and stated that employer retained right to fire employee any time without cause).

Here, in light of the fact that plaintiff signed an acknowledgment that the Handbook was neither a contract of employment nor a legal document, I conclude that no reasonable jury could find that she was justified in regarding the Handbook as a legally enforceable, binding commitment concerning the terms and conditions of her employment. Accordingly, defendant is entitled to judgment as a matter of law on Count IV of the complaint.

ORDER

*10 For the foregoing reasons, it is hereby *ORDERED* that defendant's partial motion for summary judgment is *ALLOWED* as to Counts II, III and IV of the verified complaint.

Not Reported in N.E.2d, 17 Mass.L.Rptr. 13, 2003 WL 22481100 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1999 MASS. SUPER. LEXIS 272

Linn Haddad v. William F. Scanlon, Jr. n1 et al. n2

n1 Individually and as Mayor of the City of Beverly.
n2 John Dunn, individually and as Director of Municipal Finance of the City of
Beverly; Thomas L'Italien, individually and as Director of Human Resources of the
City of Beverly; and the City of Beverly.

99–180

SUPERIOR COURT OF MASSACHUSETTS, AT ESSEX

10 Mass. L. Rep. 298; 1999 Mass. Super. LEXIS 272

July 16, 1999, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss ALLOWED IN PART and DENIED IN PART. As against defendant City of Beverly, Counts II, III, V, and VI are dismissed. As against all other defendants, Counts IV and V are dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, city and city officials, moved to dismiss all accompanying counts in plaintiff whistleblower's action for wrongful discharge under the Whistleblowers Act, *Mass. Gen. Laws ch. 149, § 185*, claiming that she had waived all other rights and remedies pursuant to *Mass. Gen. Laws ch. 149, § 185(f)*.

**OVERVIEW:** After she was terminated for refusing to undervalue certain property for tax purposes and for disclosing her employer's alleged attempts to undervalue the property to the State Department of Revenue, plaintiff brought suit under the Whistleblowers Act, *Mass. Gen. Laws ch. 149, § 185*. Her pleading also contained various other claims in tort, contract, and civil rights violations. Defendants moved to dismiss plaintiff's additional claims, arguing that she had waived all other rights and remedies under *Mass. Gen. Laws ch. 149, § 185(f)*. The court found that plaintiff only waived those rights and remedies arising out of the retaliatory action. Those claims with a sufficiently separate basis were not waived. Therefore, plaintiff's claim for violation of the covenant of good faith and fair dealing was not waived against defendant city, and neither were her claims for intentional infliction of emotional distress, defamation, and civil rights violations against the other defendants.

**OUTCOME:** Defendants' motion allowed in part and de-

nied in part; accompanying claims against defendants, city and city officials, in wrongful termination action were not dismissed because plaintiff whistleblower only waived rights and remedies arising out of the retaliatory action; claims with a sufficiently separate basis were not waived.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Discrimination > Retaliation*
*Labor & Employment Law > Wrongful Termination > Whistleblowers*

[HN1] Under the Whistleblower's Act, *Mass. Gen. Laws ch. 149, §§ 185(b)(1)* and (3), public employers are prohibited from taking retaliatory action against an employee because the employee discloses an activity, policy, or practice of the employer which the employee reasonably believes is in violation of the law or because the employee objects to or refuses to participate in such activity, policy, or practice. Retaliatory action is defined as the discharge, suspension, or demotion of an employee or other adverse employment action taken against an employee in the terms and conditions of employment under *Mass. Gen. Laws ch. 149, § 185(a)(5)*.

*Torts > Business & Employment Torts > Wrongful Termination*
*Labor & Employment Law > Wrongful Termination > Whistleblowers*

[HN2] Pursuant to *Mass. Gen. Laws ch. 149, § 185(d)*, a private cause of action is provided to any employee aggrieved by a violation of the Whistleblower Act (Act). In addition to the remedies provided in the Act, which include reinstatement of fringe benefits and seniority rights, three times lost wages and benefits and other remunera-

Case 1:05-cv-11806-RWZ    Document 5    Filed 11/15/2005    Page 24 of 35

Page 2

10 Mass. L. Rep. 298; 1999 Mass. Super. LEXIS 272, *1

tion, and attorney's fees and costs, the statute provides that all remedies available in common law tort actions shall be available to prevailing plaintiffs. The Act further provides, in *Mass. Gen. Laws ch. 149, § 185(f)*, however, that the institution of a private action in accordance with *Mass. Gen. Laws ch. 149, § 185(d)*, shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law.

### *Governments > Legislation > Interpretation*

[HN3] When construing a statute, the text of a statute must be afforded its plain meaning when it is clear and unambiguous. When ambiguities are present, however, a statute must be interpreted according to the intent of the legislature. The intent of the legislature in enacting legislation is to be ascertained from all the words of the statute construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.

### *Governments > Legislation > Interpretation*

[HN4] Several other rules of statutory construction also inform the court's interpretation. First, statutes are to be construed in light of the preexisting common law. Remedial legislation should be construed broadly so as to accomplish more fully the remedial purpose which prompted its passage. At the same time, a provision requiring a plaintiff to waive other available remedies should be narrowly construed, because statutes in derogation of common law are to be construed narrowly. Construction of a statute intended to modify the common law should advance, not defeat, the purpose of legislature. Further, the court should, if possible, construe allegedly conflicting provisions of a statute in a way that is harmonious and consistent with the legislative design. And finally, a court should avoid an overly literal reading of the waiver provision if to do so would be inconsistent with legislative intent.

### *Torts > Business & Employment Torts > Wrongful Termination*
### *Labor & Employment Law > Discrimination > Retaliation*
### *Labor & Employment Law > Wrongful Termination > Whistleblowers*

[HN5] The overriding purpose of the Whistleblower's Act is to encourage state workers to exercise their rights under the act, namely the right to refuse to participate in and the right to report activities of the employer that the employee reasonably believes violates the law or poses a risk to public health, safety, or the environment, and to

discourage state employers from violating those rights. Employers are prohibited from retaliatory action against employees who disclose or threaten to disclose employer activity which employees reasonably believe poses a risk to public health, safety, or environment. Liability may be imposed on an employer who terminates at-will employee in violation of clearly established public policy. The statute is, therefore, an expansion of the common law with the result, and inferred intent, that it should now be easier for state employees to sue and recover against employers who take retaliatory action against them.

### *Torts > Business & Employment Torts > Wrongful Termination*
### *Labor & Employment Law > Discrimination > Retaliation*
### *Labor & Employment Law > Wrongful Termination > Whistleblowers*

[HN6] The waiver provision of *Mass. Gen. Laws ch. 149, § 185(f)*, relates specifically to rights and remedies available if the employee is wrongfully discharged, or otherwise penalized in the terms of their employment, as a result of disclosure activities, but it does not mean waiver of all rights and remedies which arise out of the employment relationship. An employee may not simultaneously claim statutory and common law causes of action for the wrongful discharge. An employee may, however, pursue any contractual, common law, or other statutory claim that is sufficiently distinct from the discharge claim. Accordingly, the court holds that a state employee who institutes an action under *Mass. Gen. Laws ch. 149, § 185(d)*, waives all rights and remedies arising out of the retaliatory action, but does not waive claims which are substantially separate from and independent of the cause of action to recover for the retaliatory action.

### *Torts > Business & Employment Torts > Interference With a Contract*

[HN7] To prove a claim of unlawful interference with contractual relations, a plaintiff must show that (1) he has a contract with a third party, (2) the defendant, through improper means or motive, knowingly induces the third party to break the contract, and (3) the plaintiff is injured.

### *Administrative Law > Sovereign Immunity*
### *Torts > Public Entity Liability > Immunity*

[HN8] Under the Massachusetts Tort Claims Act, *Mass. Gen. Laws ch. 258, § 10(c)*, public employers are exempted from liability for any claim arising out of an intentional tort.

**JUDGES:** Richard E. Welch III, Justice of the Superior Court.

**OPINIONBY:** RICHARD E. WELCH III

Case 1:05-cv-11806-RWZ   Document 5   Filed 11/15/2005   Page 25 of 35

Page 3

10 Mass. L. Rep. 298; 1999 Mass. Super. LEXIS 272, *1

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

In her complaint, plaintiff Linn Haddad ("Haddad") alleges she was wrongfully terminated from her position as Chief Assessor for the City of Beverly in retaliation for her refusal to undervalue a certain property and for disclosing her employer's alleged attempts to of undervalue the property. Haddad claims violations of *G.L.c. 149, 185*, (Count I), intentional infliction of emotional distress (Count II), defamation (Count III), interference with contractual relations (Count IV), n3 violation of the covenant of good faith and fair dealing (Count V), and violations of *G.L.c. 12, 11I* (Count VI). Arguing that Haddad, by instituting an action under *G.L.c. 149, 185*, has waived all other rights and remedies, all defendants now move to dismiss Counts II, IV, V, and VI. For the reasons discussed below, the defendants' [*2] motion will be allowed in part and denied in part.

> n3 Haddad seeks relief against only the individual defendants in this count. All other counts were instituted against all defendants.

### BACKGROUND

The undisputed facts, or facts taken in favor of plaintiff as non-moving party, are as follows. On April 8, 1996, Haddad was appointed acting chief assessor for the City of Beverly, and on June 6, 1998, she was appointed as chief assessor to complete the remainder of an unexpired term which was set to expire January 1, 1997. Haddad continued to serve in office beyond the expiration of the term.

In the fall of 1996, defendant William Scanlon ("Scanlon"), the mayor of the City of Beverly, ordered Haddad to abate 25% of Herrick House's 1995 and 1996 taxes and to exempt the property from taxation entirely for 1997 and all subsequent years. Herrick House is an assisted living facility located in Beverly, and according to *G.L.c. 19D, 18(c)*, is required to be assessed at full value. Herrick House had previously filed [*3] abatement applications for 1995 and 1996. The abatement applications were denied by the Board of Assessors and appeals were filed with the Appellate Tax Board. Haddad refused to comply with Scanlon's order to value Herrick House below full value. In November 1996, at a meeting of the Beverly Board of Assessors and the City Solicitors, Scanlon publicly berated and verbally abused Haddad for refusing to undervalue Herrick House.

In January 1997, Scanlon refused to officially reappoint Haddad to the Board of Assesors. In May 1997 Haddad notified an official at the Massachusetts Department of Revenue that she had been ordered by Scanlon to assess Herrick House in an unlawful manner. In December 1997, Haddad related the problems she had with Scanlon relative to the Herrick House to the President of the Beverly City Council.

On April 9, 1998, Haddad requested medical leave pursuant to the Family and Medical Leave Act. On June 5, 1998, while on that leave, she was terminated as an employee of the City of Beverly.

### DISCUSSION

[HN1]

*G.L.c. 149, 185*, or the Whistleblower's Act, prohibits public employers from taking retaliatory action against an employee because the employee discloses [*4] an activity, policy, or practice of the employer which the employee reasonably believes is in violation of the law or because the employee objects to or refuses to participate in such activity, policy, or practice. See, *G.L.c. 149, 185(b)(1)* and (3). Retaliatory action is defined as the "discharge, suspension, or demotion of an employee or other adverse employment action taken against an employee in the terms and conditions of employment." *G.L.c. 149, 185(a)(5)*. [HN2] The statute provides a private cause of action to any employee aggrieved by a violation of the statute. See G.L.c. 149, (d). In addition to the remedies provided in the statute, which include reinstatement of fringe benefits and seniority rights, three times lost wages and benefits and other remuneration, and attorney's fees and costs, the statute provides that "all remedies available in common law tort actions shall be available to prevailing plaintiffs." *Id.* The statute further provides, however, that "the institution of a private action in accordance with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any other contract, collective [*5] bargaining agreement, state law, rule or regulation, or under the common law." G.L.c. 149, (f).

In their motion to dismiss, the defendants argue that, by invoking *G.L.c. 149, 185*, and pursuant Section (f) of that statute, Haddad has waived all other tort and contract claims that arise out of her allegedly retaliatory termination or other adverse employment action. In response, Haddad argues that because Section (d), which states that all common law remedies are available to plaintiffs, and Section (f), which states that a plaintiff waives all common law rights and remedies, are apparently in conflict, it is unclear which rights are waived and which are preserved. The disagreement between the parties thus focuses on the

Case 1:05-cv-11806-RWZ    Document 5    Filed 11/15/2005    Page 26 of 35

Page 4

10 Mass. L. Rep. 298; 1999 Mass. Super. LEXIS 272, *5

scope of the waiver provision. n4

n4 Haddad raises two additional arguments. First, Haddad argues that, even if the court interprets the waiver provision as barring all of Haddad's other claims against the City of Beverly, nothing in the statute restricts claims against individual defendants who are not employees. However, with the exception of the defamation count, the individuals named in this suit are being sued because of the actions they took in their capacity as city officials and their ability to affect her employment with the City of Beverly. If the Court were to adopt Haddad's reasoning, plaintiffs could circumvent the waiver provision and the provision would be rendered meaningless. Second, Haddad argues that at trial she might not convince a jury that she was terminated in contravention of the Whistleblowers Act, but could recover under her common law causes of action. While this may be true, it is not a compelling reason for this court to essentially ignore the waiver provision contained in the statute. The statute provides a generous remedy to, along with requiring a waiver by, an employee who wishes to invoke it. Nothing in statute requires an employee to sue under the statute, and the statute is quite clear that it was not intended to be a mandatory or exclusive remedy against an employer. See *G.L.c. 149, 185(f)*; compare *G.L.c.152, 24*.

[*6]

Massachusetts courts have yet to interpret this statute and the scope of its waiver provision. In its interpretation of the statute, this court will, however, be guided by the rules of statutory construction. [HN3] When construing a statute, "the text [of a statute] must be afforded it plain meaning when it is clear and unambiguous. When ambiguities are present, however, 'a statute must be interpreted according to the intent of the Legislature.' " *Singer Friedlander Corp. v. State Lottery Comm., 423 Mass. 562, 564, 670 N.E.2d 144 (1996)* (alteration in original) (citations omitted). Accordingly, because the court finds the waiver provision ambiguous, the court will need to determine the intent of the legislature. The intent of the legislature in enacting legislation is to be "ascertained from all the words [of the statute] construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Id., at 564–65* (citations omitted). [HN4]

Several other rules [*7] of statutory construction also inform the court's interpretation. First, statutes are to be construed in light of the preexisting common law. See *Ferullo's Case  331 Mass. 635  637, 121 N.E.2d 858 (1954)*. Remedial legislation, such as that at issue here, should be construed broadly "so as to accomplish more fully the remedial purpose which prompted its passage." *Boston v. Hospital Transportation Service, Inc., 6 Mass. App. Ct. 198, 201–02, 374 N.E.2d 338 (1978)*. At the same time, this waiver provision should be narrowly construed. See *Kerins v. Lima, 425 Mass. 108, 110, 680 N.E.2d 32 (1997)* (statutes in derogation of common law to be construed narrowly); see also *Falmouth Ob-Gyn Assoc., Inc. v. Abisla, 417 Mass. 176, 179, 629 N.E.2d 291 (1994)* (construction of statute intended to modify common law should advance, not defeat, purpose of legislature). Further, the court should, if possible, construe allegedly conflicting provisions of a statute "in a way that is harmonious and consistent with the legislative design." *Peters v. Michienzi, 385 Mass. 533, 537, 432 N.E.2d 696 (1982)*; see also *Doliner v. Planning Board of Millis, 343 Mass. 1, 5, 175 N.E.2d 919 (1961)*. [*8] And finally, a court should avoid an overly literal reading of the waiver provision "if to do so would be inconsistent with legislative intent." *Town of Oxford v. Oxford Water Co., 391 Mass. 581, 592, 463 N.E.2d 330 (1984)*.

[HN5]

Clearly, the overriding purpose of the Whistleblower's Act is to encourage state workers to exercise their rights under the act—namely the right to refuse to participate in and the right to report activities of the employer that the employee reasonably believes violates the law or poses a risk to public health, safety or the environment—and to discourage state employers from violating those rights. Examined against the background of common law rights for wrongful termination, this statute provides broader protections to state workers than the common law did. Compare G.L.c. 149, (b)(1) (employer prohibited from retaliatory action against employee who discloses or threatens to disclose employer activity which employee reasonably believed posed a risk to public health, safety or environment); with *Upton v. JWP Businessland, 425 Mass. 756, 757–58, 682 N.E.2d 1357 (1997)* (liability may be imposed on employer who terminates at-will [*9] employee in violation of clearly established public policy) and cases cited. The statute is, therefore, an expansion of the common law with the result, and inferred intent, that it should now be easier for state employees to sue and recover against employers who take retaliatory action against them.

Given the above discussion, it seems unlikely that the legislature, by including the waiver provision, intended to penalize an aggrieved employee who elects to pursue a

cause of action under the Whistleblowers Act by requiring them to waive all other rights and claims that arise out of the employment relationship, whether by contract or law. Such a literal reading of the provision would lead to a result that is contrary to the purpose of the statute as a whole. Rather, a more logical reading of the purpose of waiver provision, and one more consistent with the introductory language of the waiver provision itself, is that the legislature intended to prevent an employee's duplicative or cumulative recovery based on the retaliatory action. [HN6] The waiver provision relates specifically to rights and remedies available if the employee is wrongfully discharged, or otherwise penalized in the terms [*10] of their employment, as a result of disclosure activities, but it does not mean waiver of all rights and remedies which arise out of the employment relationship. That is, an employee may not simultaneously claim statutory and common law causes of action for the wrongful discharge. An employee may, however, pursue any contractual, common law, or other statutory claim that is sufficiently distinct from the discharge claim. Accordingly, the court holds that a state employee who institutes an action under G.L.c. 149, 185(d), waives all rights and remedies arising out of the retaliatory action, but does not waive claims which are substantially separate from and independent of the cause of action to recover for the retaliatory action.

Application of the above interpretation of the waiver provision to the present case results in dismissal of the plaintiff's claims for interference with contractual relations (Count IV) and for violation of the covenant of good faith and fair dealing (Count V). [HN7] To prove a claim of unlawful interference with contractual relations, a plaintiff must show that he had a contract with a third party, the defendant, *through improper means or motive*, knowingly [*11] induced the third party to break the contract, and the plaintiff was injured. See *Draghetti v. Chmielewski, 416 Mass. 808, 816, 626 N.E.2d 862 (1994)*. Because it requires proof of improper motive or means, this claim is essentially a common law claim of retaliation, it arises solely out of the termination, and is thus deemed waived. Additionally, plaintiff's violation of good faith and fair dealing claim is essentially a breach of employment contract claim, which claim arises solely out of the termination, and is therefore also deemed waived. Accordingly, Count IV and Count V will be dismissed against all defendants.

Conversely, plaintiff's intentional infliction of emotional distress and her civil rights claims (Counts II and VI) are not deemed waived in the circumstances of this case. The plaintiff has alleged conduct independent of the discharge which could support such claims. However, the burden will be on plaintiff to show not only that distinct actions,

i.e. not just termination, form the basis of her emotional distress and civil rights claims, but to also show distinct damages.

This holding is in accordance with the New Jersey courts interpretation [*12] of an identical waiver provision contained in their own version of a whistleblowers act, known as the Conscientious Employee Protection Act ("CEPA"). See *N.J. Stat. Ann. 34:19-1* et seq. CEPA is substantially similar to the Massachusetts act, n5 and is identical in its waiver provision n6 and its "all common law tort remedies available" statement. n7 See *N.J. Stat. Ann. 34:19-5* and 34:19-8 (West 1988 & Supp. 1999). In the leading case interpreting the scope of the waiver provision, the Supreme Court of New Jersey stated that "the [CEPA] waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA," and "does not prevent an employee from proceeding with his or her common-law tort and contract claims that are sufficiently distinct from the CEPA claim." *Young v. Schering Corp, 141 N.J. 16, 660 A.2d 1153, 1155, 1160 (N.J. 1995)*. The court went on to affirm the lower court's dismissal of plaintiff's common-law claims of interference with business relationships and intentional infliction of emotional distress. The lower court had dismissed those claims on the theory that the plaintiff sought essentially [*13] the same relief under those claims as under the CEPA claim and the claims were therefore barred by the waiver provision. *660 A.2d at 1156, 1162*. n8

> n5 The major differences between Massachusetts' and New Jersey's whistleblower statutes are: (1) CEPA applies to all employers, not just public employers; compare G.L.c. 145, 185(a)(2) with *N.J. Stat. Ann. 34:19-2(a)* (West 1988); (2) Massachusetts protects employees who disclose or threaten to disclose, or object to or refuse to participate in an activity that the employee reasonably believes poses a risk to the public health safety or environment whereas CEPA protects only those employees who object to or refuse to participate in an activity that is incompatible with a clear mandate of the public policy concerning the public health, safety, welfare or protection of the environment; compare G.L.c. 149, (b)(1) and (2) with *N.J. Stat. Ann. 34:19-3(c)(3)* (West 1988 & Supp. 1999); (3) CEPA has as one year statute of limitations as opposed to the two year limit in Massachusetts; compare *G.L.c. 149, 185(d)* with *N.J. Stat. Ann. 34:19-5* (West 1988); (4) CEPA explicitly protects health care workers who report or object to improper patient care; see *N.J. Stat. Ann. 34:19-3(a)*, (b) and (c)(1); and (5) the remedies provided by the statutes are

Case 1:05-cv-11806-RWZ   Document 5   Filed 11/15/2005   Page 28 of 35

Page 6

10 Mass. L. Rep. 298; 1999 Mass. Super. LEXIS 272, *13

the same except that Massachusetts provides for three times lost wages and benefits, while New Jersey provides for only single lost wages and benefits but allows for punitive damages and civil fines payable to the state. Compare G.L.c. 148, 185(d) with *N.J. Stat. Ann. 34:19-5* (West 1988 & Supp. 1999).

[*14]

n6 CEPA's waiver provision provides in part: "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." *N.J. Stat. Ann. 34:19-8* (West 1988).

n7 CEPA's remedies provision provides in part: "all remedies available in common law tort actions shall be available to prevailing plaintiffs." *N.J. Stat. Ann. 34:19-5* (West 1988 & Supp. 1999).

n8 New York also has a statute which protects employees from their employers retaliatory actions. See *N.Y. Labor Law 740* (McKinney 1988) Although the statute is significantly different from the Massachusetts act, the New York statute does contain the identical waiver provision. See *N.Y. Labor Law 740 (7)*. The sole New York case interpreting the scope of the waiver provision held the waiver barred only "those causes of action relating to retaliatory discharge," but did not prevent an employee from recovering for causes of actions "which are separate and independent from the cause of action to recover damages for retaliatory discharge." *Kraus v. Brandstetter, 185 A.D.2d 302, 586 N.Y.S.2d 269, 270 (1992)*.

[*15]

On a final note, [HN8] the Massachusetts Tort Claims Act exempts public employers from liability for any claim arising out of an intentional tort. See *G.L.c. 258, 10(c)*. Consequently, Haddad's claims against the City of Beverly for intentional infliction of emotional distress, (Count II), defamation (Count III), and violations of *G.L.c. 12, 11I* (Count VI), will be dismissed.

ORDER

It is hereby ORDERED that defendants' motion to dismiss is ALLOWED IN PART and DENIED IN PART. As against defendant City of Beverly, Counts II, III, V, and VI are dismissed. As against all other defendants, Counts IV and V, are dismissed.

Richard E. Welch III
Justice of the Superior Court

**4**

Westlaw.

Not Reported in N.E.2d

Page 1

Not Reported in N.E.2d, 16 Mass.L.Rptr. 126, 2003 WL 1699353 (Mass.Super.)

**(Cite as: 2003 WL 1699353 (Mass.Super.))**

Superior Court of Massachusetts.
CITY OF EVERETT,
v.
INTERNATIONAL BROTHERHOOD OF
POLICE OFFICERS, LOCAL 633.
**Nos. 02-2727, 02-2728.**

March 27, 2003.

***MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR
JUDGMENT ON THE PLEADINGS, OR IN
THE ALTERNATIVE,
FOR SUMMARY JUDGMENT***

RAYMOND J. BRASSARD, Justice of the
Superior Court.

\*1 This is an action pursuant to G.L. c. 150C, §
2(b), to seek a stay in connection with a demand for
arbitration filed with the American Arbitration
Association. The plaintiff alleges that the defendant,
a labor union, waived its right to arbitration when
two of its aggrieved members filed federal court
actions alleging, among other claims, violations of
the Massachusetts Whistleblower Statute, G.L. c.
149, § 185. The defendant now moves for summary
judgment. The plaintiff, in turn, cross-moves for
judgment on the pleadings or, in the alternative, for
summary judgment. For the forgoing reasons, the
defendant's Motion is **ALLOWED,** and the
plaintiff's Cross-Motion for summary judgment is
**DENIED.**

**BACKGROUND**

The plaintiff, the City of Everett ("the City"), is a
public employer pursuant to G.L. c. 150E, § 1. The
defendant, the International Brotherhood of Police
Officers, Local 633 ("IBPO" or "the union"), is the
exclusive bargaining representative, pursuant to
G.L. c. 150E, of a bargaining unit of police

patrolmen that the City employs. The City and the
IBPO are parties to a collective bargaining
agreement [FN1] that provides for grievance
arbitration of the disciplinary suspension of police
patrolmen. Section 3A.1 of the collective
bargaining agreement provides that "[e]mployees
who have completed the probationary period shall
not be disciplined or discharged except for just
cause." At all relevant times, the City employed
Officer Alan Varone ("Varone") and Officer Dennis
O'Donnell ("O'Donnell") as police patrolmen, and
the officers are considered "employees" under the
collective bargaining agreement.

> FN1. The defendant has submitted the
> following agreements between the City of
> Everett and the International Brotherhood
> of Police Officers, Local 633:(1) Effective
> July 1, 1988, and Expiring June 30, 1991;
> (2) Effective July 1, 1993, and Expiring
> June 30, 1995; (3) Effective July 1, 1995,
> and Expiring June 30, 1997; (4) Effective
> July 1, 1997, and Expiring June 30, 2000.
> The incidents that allegedly violate the
> collective bargaining agreement occurred
> in 2001. In its analysis, this court relied on
> these agreements because neither party
> disputes that the agreements are not
> controlling here, and the critical language
> regarding arbitration has not been
> superceded or amended.

During the spring of 2001, the City disciplined
Officers Varone and O'Donnell for several alleged
infractions. In the month of April 2001, the City
imposed a three-day suspension without pay and,
later, a four-tour suspension without pay on
O'Donnell. The City charged Varone with the
violation of department rules and regulations in
March 2001, and on May 3, 2001, the City imposed
a twenty-shift suspension without pay on Varone.
The IBPO filed timely demands for arbitration
related to the suspensions on behalf of both Varone

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 16 Mass.L.Rptr. 126, 2003 WL 1699353 (Mass.Super.)

**(Cite as: 2003 WL 1699353 (Mass.Super.))**

and O'Donnell, claiming the City imposed the suspensions without just cause. On March 21, 2002, both Varone and O'Donnell filed complaints in the United States District Court for the District of Massachusetts. Among the defendants was the City. The officers asserted four causes of action: violations of the First Amendment of the United States Constitution; the Massachusetts Whistleblower Statute, G.L. c. 149, § 185; the Massachusetts Civil Rights Act; and Massachusetts common law.

An arbitration demanded on behalf of Varone commenced on May 30, 2002. The arbitrator, Marc Greenbaum, relied on a provision in the Whistleblower Statute that limits a grievant's recovery in arbitration should he seek a judicial remedy and directed the City to seek a stay of arbitration in the Superior Court. The arbitration on behalf of O'Donnell has been held in abeyance and awaits the resolution of the instant case.

### DISCUSSION

\*2 This court grants summary judgment where there are no genuine issues of material fact and, if viewing the entire record in the light most favorable to the non-moving party, the moving party demonstrates it is entitled to judgment as a matter of law. Mass. R. Civ. P. 56; *Kourouvacilis v. Gen. Motors Corp.,* 410 Mass. 706, 711 (1991). See also *Parent v. Stone & Webster Eng. Corp.,* 408 Mass. 108, 112 (1990) (reasoning that the moving party bears the burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law). A party moving for summary judgment that does not bear the burden of proof at trial may demonstrate the absence of a trial issue either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. *Flesner v. Tech. Communications Corp.,* 410 Mass. 805, 809 (1991) ; *Kourouvacilis v. Gen. Motors Corp.,* 410 Mass. at 716. The nonmoving party cannot defeat the motion for summary judgment by resting on his or her pleadings and mere assertions of disputed facts. *LaLonde v. Eissner,* 405 Mass. 207, 209 (1989).

The court may consider the pleadings, affidavits, answers to interrogatories, depositions, and exhibits submitted in arriving at its conclusion on the motion. Mass. R. Civ. P. 56(c). A party may present matters outside of the pleadings when moving for judgment on the pleadings; however, if the court does not exclude these materials, the motion is treated as one for summary judgment. Mass. R. Civ. P. 12(c). Because this court considered the collective bargaining agreement between the parties in deciding this motion, both parties' motions are treated as those for summary judgment. This court concludes in the instant case that the IBPO is entitled to judgment as a matter of law.

The parties do not dispute the material facts in this matter; therefore, summary judgment for one of the parties is appropriate. This court is authorized to order a stay of an arbitration that has commenced or is threatened if the court finds that the grievance is not substantively arbitrable. G.L. c. 150, § 2(b) (expressing a preference for arbitrating labor disputes and permitting stays only where there is either no "agreement to arbitrate" or "the claim sought to be arbitrated does not state a controversy covered by the provision for arbitration"), *Sch. Comm. of Boston v. Boston Teachers Union, Local 66,* 378 Mass. 65, 70 (1979). An agreement to arbitrate a dispute that cannot lawfully be the subject of arbitration is "equivalent to the absence of a controversy covered by the provision for arbitration." *Berkshire Hills Reg'l Sch. Dist. Comm. v. Gray,* 5 Mass.App.Ct. 686, 690 (1977).

The Massachusetts legislature has limited the extent to which public employees may invoke arbitration. The words of a statute are the main source from which a court will ascertain legislative intent, and when the text of a statute is clear and unambiguous, the language will be construed in accordance with its plain and ordinary meaning. *Foss v. Commonwealth,* 437 Mass. 584, 586 (2002) ; *Weitzel v. Travelers Ins. Co.,* 417 Mass. 149, 153 (1994) ("Where the language of a statute is plain, the courts enforce the statute according to its wording."). The Massachusetts Whistleblower Statute, G.L. c. 149, § 185(f), provides that when an aggrieved public employee institutes a private civil

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-11806-RWZ   Document 5   Filed 11/15/2005   Page 32 of 35

Not Reported in N.E.2d

Page 3

Not Reported in N.E.2d, 16 Mass.L.Rptr. 126, 2003 WL 1699353 (Mass.Super.)

**(Cite as: 2003 WL 1699353 (Mass.Super.))**

action alleging that his employer's actions violated section 185, the employee waives the rights and remedies he would have received under any collective bargaining agreement. *Id.* An employee under this statute is "any individual who performs services for and under the control and direction of an employer for wages or other remuneration ." G.L. c. 149, § 185. This provision effectively eliminates any exception the common law allowed individuals to both litigate and arbitrate issues arising from the same events or set of facts. [FN2]

> FN2. "The prior submission of a claim to arbitration may have a preclusive effect on the same claim in a subsequent court action." *Blanchette v. School Comm. of Westwood,* 427 Mass. 176, 180 (1998). In determining whether a claim has been precluded, the court examines whether the "right" or "issue" that is in controversy has been previously litigated with full and careful consideration. *Id.,* citing *Miles v. Aetna Cas. & Sur. Co.,* 412 Mass. 424, 427 (1992). Federal and Massachusetts courts have distinguished the rights and remedies arising from collective bargaining agreements from the statutory rights and remedies that federal and state anti-discrimination statutes afford. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 43 (1974) (reasoning that institution of an action under Title VII is an assertion of a right independent of the rights sought in the arbitration process); *Blanchette,* 427 Mass. at 181 (finding that G.L. c. 151B protects rights independent of the rights provided in arbitration); *Boston v. Massachusetts Comm'n Against Discrimination,* 39 Mass.App.Ct. 234, 238 (1995) (same). Unlike the Whistleblower Statute, Title VII and chapter 151B do not require a complaining employee to waive the rights afforded by a separate collective bargaining agreement.

*3 This court's inquiry focuses on whether a union may proceed with arbitration when the employee the union represents has filed a separate judicial action against the employer for violation of the Whistleblower Statute. The Whistleblower Statute plainly precludes the employee, but not the union, from pursuing, through arbitration, his rights under a collective bargaining agreement once he has filed a civil action in court. Therefore, for the union to continue with this arbitration, it must have rights and remedies-- or interests--independent of the aggrieved member it represents.

The history and framework of unions suggests that they have interests and goals independent of their members. Unions represent employees "for the purposes of negotiating and enforcing the terms of the bargaining agreement." *Black-Clawson Co., v. Int'l Ass'n of Machinists Lodge 355,* 313 F.2d 179, 184 (2d Cir.1962). All unions bear a duty to fairly represent their members; additionally, unions also act "primarily for the collective good of all employees ." *Leahy v. Local 1526, Am. Fed'n of State, County & Mun. Employees,* 399 Mass. 341, 349 (1987); accord *Vaca v. Sipes,* 386 U.S. 171, 182 (1967). Cases may arise where the interests of the individual employee may be subordinated to the collective interests of all the employees in the bargaining unit. *Alexander v.. Gardner-Denver Co.,* 415 U.S. 36 (1974). In this case, the IBPO urges that it wishes to pursue the arbitration to protect the collective interest of all the employees in the bargaining unit.

The collective bargaining process includes more than the negotiations that lead to the agreement; it also includes the "resolution of grievances pursuant to the collective bargaining agreement." *Ghiglione v. School Comm. of Southbridge,* 376 Mass. 70, 73 (1978). In fact, "[t]he processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement ... The grievance procedure is, in other words, a part of the continuous bargaining process." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581 (1960). For the union, the grievance process is an assurance that similar grievances will be treated consistently and that "major problem areas in the interpretation of the collective bargaining contract can be isolated and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 16 Mass.L.Rptr. 126, 2003 WL 1699353 (Mass.Super.)

(Cite as: 2003 WL 1699353 (Mass.Super.))

Page 4

perhaps resolved." *Vaca v. Sipes,* 386 U.S. at 191. It is clear from the case law that as a party to the collective bargaining agreement, the union has an interest in establishing the meaning and content of the agreement and, therefore, an interest in the grievance process.

Officers Varone and O'Donnell each independently initiated arbitration pursuant to Section 12.8 of the collective bargaining agreement, which provides for arbitration as follows:

"Any matter involving the suspension, dismissal, removal, or termination of any employee who has completed his probationary period shall not be subject to arbitration unless the employee and the Union elect arbitration as the exclusive remedy pursuant to MGL Chapter 150E, Section 8. The written election to arbitrate shall shall [sic] constitute the grievance hereunder." [FN3]

> FN3. G.L. c. 150E, § 8, provides: "The parties [to a collective bargaining agreement] may include in any written agreement a grievance procedure culminating in final and binding arbitration to be invoked in the event of any dispute concerning the interpretation or application of such written agreement."

*4 Arbitration is, at its core, "a matter of contract ..." *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241 (1962). To determine who has the power to seek arbitration, courts look to the collective bargaining agreement. See *Vaca v. Sipes,* 386 U.S. at 186. The agreement at issue does not require arbitration to resolve matters concerning suspension, dismissal, removal or termination unless both the employee and union so elect. The Ohio Appeals Court has recently considered whether the union or employee was the interested party to grievance and arbitration proceedings. *Leon v. Boardman Township,* No. 01CV92, 2002 WL 31242236 (Ohio Ct.App. Sept. 30, 2002) (reasoning that the union, and not the aggrieved employee, was the party to the arbitration and had standing to vacate an arbitration decision); *Geneva Patrolmen's Ass'n v. City of Geneva,* 473 N.E.2d 1317 (Ohio Ct.App.1984) (reasoning that the aggrieved

employee, and not the union, was the party to the arbitration). To make this determination, the Court examined who controlled the grievance and arbitration process and concluded that the party who controlled the processes was the party to the proceeding. *Leon v. Boardman Township,* at *3; *Geneva Patrolmen's Ass'n v. City of Geneva,* 473 N.E.2d at 1319. In the instant case, the arbitration agreement requires both the union and the individual employee to assent to the arbitration process. The logical conclusion is that both the aggrieved employee and the union are interested parties to the arbitration.

Undoubtedly, individual employees have an interest in the arbitration proceedings commenced on their behalf; however, once the union commences arbitration on behalf of an employee, the union, too, possesses an interest in the outcome. In cases where the aggrieved employee has attempted to vacate an arbitrator's decision, the United States Supreme Court has considered the union, and not the employee, as the party to the arbitration, reasoning that upon submitting his matter to grievance proceedings and arbitration, the employee "called upon the collective power of his or her fellow members and ceased to stand alone." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 564 (1976). Likewise, Officers Varone and O'Donnell had no ability to submit their grievances to arbitration without the IBPO's participation, and by pursuing arbitration, the collective members of the IPBO now have an interest in the proceeding.

An arbitrator's award may, of course, result in a variety of remedies, such as back pay or expungement of discipline from personnel records. Such remedies directly affect the aggrieved employee. Because the aggrieved employees have commenced civil actions in federal court, Officers Varone and O'Donnell may not be awarded any such remedy or receive any other direct benefit from the arbitration between the City of Everett and the IBPO. The IBPO may, however, pursue the arbitration to give "meaning and content" to the collective bargaining agreement for the benefit of all its members. [FN4]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 5

Not Reported in N.E.2d, 16 Mass.L.Rptr. 126, 2003 WL 1699353 (Mass.Super.)

**(Cite as: 2003 WL 1699353 (Mass.Super.))**

> FN4. An arbitration conducted in accordance with these conditions will undoubtedly involve the employees as they will likely be witnesses. In that sense, the arbitration will meet the substance of the collective bargaining agreement to the effect that both the employees and the union are participants. Such an arbitration will also permit the union to pursue its own interests.

### *ORDER*

\*5 For all of the reasons contained herein, it is ***ORDERED*** that the defendant's Motion for Summary Judgment be ***ALLOWED.*** It is further ***ORDERED*** that the plaintiff's Cross-Motion for Summary Judgment be ***DENIED.***

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 5-11806 RWZ

JODY REILLY,
    Plaintiff

V.

**DEFENDANT'S 7.1 CERTIFICATE**

THOMAS ROBBINS, as Colonel
of the Massachusetts State Police
    Defendant

## DEFENDANTS' 7.1 CERTIFICATE

Pursuant to Local Rule 7.1, Assistant Attorney General Maite A. Parsi ("AAG Parsi"),
counsel for Thomas Robbins, as Colonel of the Massachusetts State Police, certifies that as
counsel to the Defendant she has unsuccessfully attempted in good faith to confer with
plaintiff's counsel and to resolve or narrow the issues in the above-referenced case.

Maite A. Parsi, BBO No. 554009
Assistant Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
617-727-2200 x3322
Maite.parsi@ago.state.ma.us

Dated: November 4, 2005

## CERTIFICATE OF SERVICE

I certify that on this 4th day of November 2005 I served the above document on
counsel for the plaintiff, Scott Lang and Gigi Tierney, Lang Xifaras & Bullard,115 Orchard
Street, New Bedford MA 02740, by regular mail, postage prepaid.

Maite A. Parsi