UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11806 RWZ

JODY REILLY
     Plaintiff

v.

THOMAS ROBBINS, as Colonel of
the Massachusetts State Police
     Defendant

**PLAINTIFF, JODY REILLY'S MEMORANDUM IN OPPOSITION TO THE
DEFENDANT'S MOTION TO DISMISS COUNT IV OF THE AMENDED
COMPLAINT**

## I.     Summary of Argument

The Defendant is not entitled to have Count IV of the Plaintiff's Amended Complaint

for Retaliation in Violation of Massachusetts General Laws Chapter 151B, § 4 (4), (4A), (5)

dismissed as waived by Plaintiff's prior action in state court because Count IV of Plaintiff's

Amended Complaint specifically alleges claims arising from numerous retaliatory acts that

are separate and distinct from the single act alleged by her previous state court action.  At

most, an employee who brings suit under the Whistleblower Act waives only those rights and

remedies arising from the employer's **same** retaliatory actions "under any other contract,

collective bargaining agreement, state law, rule or regulation, or under the common law."

Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 194 (D. Mass. 2005) (Young, C.J.), citing

Mass. Gen. L. c. 149 Sec. 185(f) and Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 220-

221 (D. Mass. 2002) (Ponsor, J.) (emphasis added).

The inaccuracy of Defendant's claim that the retaliatory acts alleged in the state action

are the "same" as the retaliatory acts alleged in Count IV of this federal action is plain from

the face of the two complaints in question.  Plaintiff's state action alleged only one retaliatory

act:  the temporary transfer of Plaintiff from her Air Wing unit.  Count IV of the Plaintiff's

Amended Complaint alleges retaliatory claims that are specific to Massachusetts General Law

c. 151B and that arise from at least twenty-four other distinct retaliatory acts or circumstances

alleged in the Amended Complaint, including, but not limited to:  (i) conducting an improper

and retaliatory investigation of her complaints of gender discrimination and sexual

harassment, (ii) assigning the Plaintiff, a licensed commercial helicopter pilot, to the Motor

Vehicle Regulatory Section, (iii) repeatedly contacting the Federal Aviation Administration

("FAA") in an effort to have her pilot's license revoked, culminating in (iv) a prospective 18

month suspension and (v) seeking to permanently bar the Plaintiff from ever working again in

the Air Wing Unit.  Moreover, several of the acts addressed in the Plaintiff's Amended

Complaint in this matter occurred after the state Whistleblower Complaint was filed.  Plaintiff

cannot have waived her rights and remedies for acts not alleged or for acts that had not yet

occurred at that time, and for which she did not seek remedy for or relief from in the state

action, regardless of the standard used to define the scope of any purported waiver.

　　　　With respect to the one retaliatory act that Count IV of the Plaintiff's Amended

Complaint and her state action both allege, the Defendant's involuntary transfer of her from

the Air Wing, the Court may not proceed to apply any waiver unless the claims found to be

waived "…may actually be pursued substantively via the Whistleblower Statute.  …if a claim

cannot be pursued … the waiver provision cannot be invoked to bar the claim…"  Bennett at

221.

## II.  Capacity of Persons Sued

　　　　With respect to Defendant's argument that a suit against a public official is necessarily

a suit only against the governmental entity itself, the First Circuit has adopted the "course of

proceedings test," where courts are not limited by the presence or absence of language specifying capacity to sue on the face of the Complaint alone.  Rather, courts may examine "the substance of the pleadings and the course of proceedings to determine whether a suit is for individual or official liability."  Powell v. Alexander et al, 391 F.3d 1, 22 (1st Cir. 2004) (Lipez, J), quoting Pride v. Does, 997 F.2d 712, 715 (10th Cir. 1993).

Factors relevant to the court's analysis under the course of proceedings test include the nature of the plaintiff's claims, requests for compensatory or punitive damages, the nature of any defenses raised to the complaint, and "whether the parties are still in the early stages of litigation" where amendment of the complaint may be appropriate.  Powell, 391 F.3d at 22 (1st Cir. 2004) (Lipez, J), quoting Moore v. City of Harriman, 272 F. 3d 769, 772 at n.1 (6th Cir. 2001).  Here, Plaintiff Jody Reilly seeks compensatory as well as punitive damages and the Defendant has not yet filed an Answer.  Plaintiff seeks to preserve her claims against Defendant Thomas Robbins and others as individuals and states that it would be premature to dispose of these claims at this time.

## II.     Statement of Facts
### Background

The Plaintiff, Jody Reilly, has been employed by the Massachusetts Department of State Police ("MSP") since June 7, 1993 (Amended Complaint ¶10).  In March, 2000, the MSP assigned Plaintiff to work in its Air Wing as a Tactical Flight Officer (Amended Complaint ¶14, 15).  Plaintiff was subsequently promoted to the position of Lead Tactical Flight Officer and in 2001 selected for helicopter pilot training on the basis of her competent work performance.  (Amended Complaint, ¶16-17).

In September, 2001, the Plaintiff earned and received her commercial helicopter pilot license from the FAA.  The MSP both monitored and provided the Plaintiff's helicopter pilot

training.  The Plaintiff's licensure was based, in part, on her score of 98 (out of 100) on her

commercial helicopter pilot license examination, which far exceeded the minimum passing

score of 70. (Amended Complaint, ¶18-20).  With her license, the Plaintiff became the first

female helicopter pilot employed by the MSP.  (Amended Complaint ¶ 21).  In January 2002

Plaintiff earned an instrument rating from the FAA, again achieving high examination scores;

on August 19, 2002, she was released by the MSP as a "probationary aircraft commander."

(Amended Complaint ¶22-24).  However, from the time that Plaintiff earned her pilot's

license and continuing throughout her employment, she was repeatedly singled out as a

female, subjected to disparate treatment on the basis of her gender, subjected to sexual

advances, and repeatedly retaliated against when she opposed these illegal employment

practices (Amended Complaint ¶25).

### Plaintiff's Sexual Harassment and Gender Discrimination Complaint

On May 25, 2003, the Plaintiff filed a sexual harassment complaint against Lieutenant

Michael Barry with the MSP Harassment Investigation Unit. (Amended Complaint ¶37).  This

complaint followed complaints another trooper, Kurt Burchfiel, and she made separately on

April 30 and May 7, 2003 regarding an incident of hostile and offensive sexual conduct in the

workplace that occurred when a trooper conducting a training exercise in a pool likened the

equipment being used to a male's genitals (Amended Complaint ¶30 and 33).  The Plaintiff

made the complaints she filed on May 7 and May 25, 2003 after being subjected to numerous

instances of sexual harassment and disparate treatment on the basis of gender such as: (i)

having to fend off the sexual advances of her superior officer, Lieutenant Michael Barry

(Amended Complaint ¶28a), and (ii) deal with his sometimes bizarre behavior such as in one

incident telling her that he "loved [her] like a sister," driving her off the Air base and talking

at her at length, alone in his car and in a manner that made her extremely uncomfortable,

about how "all fucked up" he was because she was no longer assigned to fly with him

(Amended Complaint ¶28b); (iii) Lt. Barry and others spreading false rumors about her

character, personal life, qualifications, competence; (iv) Lt. Barry and others blocking her

ability to advance by denying her reasonable training and advancement requests (Amended

Complaint ¶25e, 25h, 25i and 30), (v) Lt. Barry and others retroactively changing

advancement requirements to prevent the Plaintiff from advancing (Amended Complaint

¶30), (vi) Lt. Barry and others instigating or joining in a crusade to get the FAA to revoke

licenses that the Plaintiff had rightfully earned (Amended Complaint, ¶25g and Exhibit 1,

copy of August 5, 2002 letter), (vii) Lt. Barry further ostracizing the Plaintiff by informing

members of the Air Wing that the Plaintiff had complained of the April 29, 2003 pool incident

(Amended Complaint ¶35) and chastising troopers who befriended the Plaintiff or also

complained of the sexual harassment (Amended Complaint ¶25m); and (viii) the Defendant

and the Defendant's agents and employees wrongly blaming the Plaintiff herself for the

discriminatory and hostile environment she suffered, characterizing it as a "morale" problem

in the Air Wing she apparently caused by being there and being a woman (Amended

Complaint ¶25d, 25e, 26, 28c and 43h).

### The Retaliation

In response to the Plaintiff's sexual harassment and gender discrimination complaints,

the Defendant and the Defendant's agents and employees conducted punitive and retaliatory

investigations of her complaints, which included but was not limited to:  (i) monitoring

Plaintiff's activities outside of work hours, (ii) making an unprecedented request for the

Plaintiff's flight log books when the MSP had its own records documenting Plaintiff's flight

6

training, (iii) scrutinizing the Plaintiff's log books after having them in their possession for over a year, (iv) questioning her instructors, (v) inquiring about her examination scores, (vi) repeatedly contacting the FAA to question her licensure when its own records backed up Plaintiff's flight times  and (v) repeatedly attempting to have the Plaintiff's pilot's licensure revoked.  (Amended Complaint ¶25a and ¶43).  These actions were not only irrelevant to and in retaliation for her complaints of gender discrimination and sexual harassment, but singled her out and subjected her to a level of scrutiny not applied to male troopers in the Air Wing.

In the Summer of 2003, after the Plaintiff had filed her sexual harassment complaint with the MSP's Harassment Investigation Unit, Lieutenant Colonel Oscar Langford conducted a meeting with the Air Wing staff in which he responded to the Plaintiff's sexual harassment complaint by stating that the Air Wing had become an embarrassment to him; he wanted all of the "bickering and foolishness to stop," and the next time an Air Wing staff member wrote a letter, he would "lay the hammer down" and transfer the staff member (Amended Complaint ¶43b).

After the Plaintiff voiced her opposition to the gender discrimination and sexual harassment to which she was subjected in her workplace, Lieutenant Barry told her that he was looking to have the FAA write a letter stating that she should not have been licensed on September 16, 2001, but that she had since qualified with her flight time after September 16, 2001 (Amended Complaint ¶43c).  All the while, the MSP continued to allow the Plaintiff to fly.

In July of 2003, after the Plaintiff filed her complaint against Lieutenant Barry, MSP Chief Legal Counsel Eleanor Sinnott responded to a letter from the FAA stating that the Plaintiff's commercial helicopter pilot's license was valid by informing the FAA that its letter

was "unacceptable" and requesting another letter (Exhibit 2, copy of letter dated July 21, 2003 and Exhibit 3, copy of letter dated July 28, 2003).  The FAA responded by informing Attorney Sinnott that the Plaintiff's license was valid  (Amended Complaint ¶25j, Exhibit 2, copy of letter dated July 21, 2003 and Exhibit 3, copy of letter dated July 28, 2003).

On August 12, 2003, Attorney Sinnott, in a meeting with the Plaintiff, the Plaintiff's attorney, Lieutenant Christine Bernard McNamara of the MSP's Harassment Division, and MSP Lieutenant Colonel Bradley Hibbard, denied contacting the FAA regarding revoking the Plaintiff's license and falsely stated that the FAA had written to her indicating that the Plaintiff's license had been issued in error.  At this point, the Defendant had had the Plaintiff's logbooks in their possession for over a year (Amended Complaint ¶25j).

On August 13, 2003, at a meeting of the Air Wing, Lieutenant Barry announced to the Plaintiff and her fellow officers that the FAA had resolved the matter of the Plaintiff's license by stating that they had made "mistakes" in connection with her license and would never issue a license in the same manner, but her license is "okay."  Lieutenant Barry misrepresented the statements of the FAA.  (Amended Complaint ¶ 25k).  Also in August of 2003 Sergeant Barry Domingos unfairly criticized the Plaintiff in a performance evaluation.  (Amended Complaint ¶25l).

On January 12, 2004, the Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination and the United States Equal Employment Opportunity Commission against her employer, the Massachusetts State Police, Former Colonel Thomas Foley, Former Deputy Superintendent/Lieutenant Colonel Bradley Hibbard, Chief Legal Counsel Eleanor Sinnott, and Lieutenant Michael Barry, for discriminating against her on the basis of her gender, sexually harassing her, and retaliating against her for complaining

regarding the Massachusetts State Police and its agents and employees' discriminatory and harassing conduct.  (Amended Complaint ¶ 39)

On January 25, 2004, after the Plaintiff filed her charge of discrimination with the Massachusetts Commission Against Discrimination, Captain Concannon and Lieutenant Lane met with the Plaintiff to discuss her "status" in the Air Wing.  During the meeting, Captain Concannon and Lieutenant Lane pulled out a copy of the charge of discrimination the Plaintiff filed with the Massachusetts Commission Against Discrimination, read a passage from it regarding the emotional distress that the Plaintiff had suffered, stated to the Plaintiff that a pilot's ability to fly may be adversely affected after an emotional or stressful incident, and asked the Plaintiff if she had fully recovered from her emotional distress.  They stated that they were concerned about all of the employees of the Air Wing feeling safe, despite the Plaintiff's assurance to them that she was fit to fly and their acknowledgment that "everyone says that [the Plaintiff is] a good pilot."  Captain Concannon and Lieutenant Lane concluded the meeting by stating that they would discuss the Plaintiff's situation with the Colonel. (Amended Complaint ¶ 43e).  This confrontation made the Plaintiff extremely uncomfortable. When shortly thereafter she consulted her superior officer, Sergeant Barry Domingos, as to what he thought about it, he told her that she should "keep the small stuff in-house." (Amended Complaint ¶43f)

In January and February, 2004, the MSP refused to respond to threats and insults that the Plaintiff had received from Lieutenant Barry's wife as a result of the Plaintiff's harassment and discrimination complaints, including Ms. Barry's statement to the Plaintiff, "You'll get yours some day."  (Amended Complaint, ¶43d)

On February 10, 2004, the MSP wrongly issued a finding that Trooper Tim Riley was "exonerated," in response to the Plaintiff's and Trooper Burchfiel's sexual harassment complaints against him.  (Amended Complaint ¶36).

On or about February 17, 2004, Trooper Matthew Domnarski circulated the Plaintiff's Massachusetts Commission Against Discrimination Charge of Discrimination to personnel around the MSP's Westover and Plymouth Air Wings.  (Amended Complaint ¶43g)

On or about February 29, 2004, Captain Michael Concannon issued a report addressed to Colonel Thomas Foley regarding an overall evaluation of the Air Wing that he had been directed to undertake.  In his report, Captain Concannon (i) acknowledges that it is common knowledge within the Air Wing that the Plaintiff had filed complaints against Lieutenant Barry and Trooper Riley alleging harassment and discrimination and addressing the Plaintiff's hostile work environment; (ii) cites the emotional distress and mental stress claims in the Plaintiff's charge of discrimination with the Massachusetts Commission Against Discrimination as a reason to question her ability to fly; (iii) criticizes the Plaintiff for failure to "put the events of the past behind [her]" and "become a team player," and (iv) states that "it was suggested that perhaps it would be best for all concerned that [the Plaintiff] not remain with the [Air Wing] during the pending department and MCAD inquiries."  (Amended Complaint, ¶43h)

On March 3, 2004, Oscar Langford, Colonel of Field Division Services for the MSP, and Captain Concannon met with the Plaintiff to inform her that Captain Concannon was recommending that she be transferred out of the Air Wing and Lieutenant Colonel Langford was effectuating this transfer, as a result of "the investigations going on," which the Plaintiff understood to be the investigation of her discrimination and harassment complaints.  In the

meeting, Lieutenant Colonel Langford stated to the Plaintiff, "You know, I don't mean to preach, but I came down there and told you that the foolishness and bickering had to stop and some people had a problem, … with what I said, but this is our Air Wing and we have to be safe and we already had a crash in 1995." The Plaintiff was not a member of the Air Wing at the time of the crash. (Amended Complaint ¶43i).

On or about March 3, 2004, the Plaintiff was involuntarily "temporarily" transferred into to the Motor Vehicle Regulatory Section, where the Plaintiff has been assigned since the date of her transfer out of the Air Wing. This assignment was against her wishes and denied her career opportunities, including the ability to work and accumulate time and experience in the profession she has chosen and earned as a helicopter pilot in the MSP, as well as substantial opportunities for overtime compensation that were available to her in the Air Wing. The only other female officer in the Air Wing was transferred out of the Air Wing at approximately the same time as the Plaintiff's transfer. (Amended Complaint, ¶43j).

The MSP Harassment Investigation Unit interviewed the Plaintiff twice in connection with the sexual harassment and gender discrimination complaints she filed against Lieutenant Barry and Trooper Riley. After interviewing the Plaintiff on June 23, 2003, the MSP's Harassment Investigation Unit called the Plaintiff back for a second interview on April 12, 2004 (Amended Complaint, ¶ 43l).

The focus of the April 12, 2004 interview was not an investigation of the Plaintiff's complaints of harassment and discrimination, but rather, a retaliatory investigation directed at the Plaintiff, the Plaintiff's relationship with her former Lieutenant, Michael Melia, and the form, not the substance, of the entries in the Plaintiff's flight log book. The MSP commenced its investigation of the Plaintiff's flight log book entries after it had the Plaintiff's log books in

its possession for over a year, when it had documentation of the accuracy of the Plaintiff's

flight log book entries in its own records from the time the entries were made (Amended

Complaint, ¶ 43l).

## The Whistleblower Complaint

In April of 2004, Plaintiff joined a group of three other state police troopers in filing a

complaint in Middlesex Superior Court alleging that the Defendant, Thomas Foley, had

retaliated against them in violation of the Massachusetts "Whistleblower" law at Mass. Gen.

L. c. 149, Sec. 185 by unilaterally transferring them all out of the MSP Air Wing unit in early

2004 (Exhibit 4, copy of state complaint ).  This involuntary transfer out of the Air Wing was

the sole retaliatory act alleged in that suit for the troopers exercising their rights to engage in

protected activities such as testifying about or cooperating in investigations of Air Wing

safety and violations of law regarding pending allegations of sexual harassment.

## Additional Retaliatory Acts After the Whistleblower Complaint Was Filed

On May 17, 2004, the MSP wrongly issued a finding that Lieutenant Barry was

"exonerated," in response to the Plaintiff's sexual harassment complaint.  (Amended

Complaint, ¶36 and 37).

In a May, 2004 Massachusetts State Police newsletter, Colonel Thomas Foley

published a "Message from the Colonel," in which he publicly disparaged the Plaintiff and

injured her reputation as a competent, safe pilot, by attributing his decision to transfer the

Plaintiff and a few of her colleagues from the Air Wing to safety reasons.  In his "message,"

Colonel Foley defended his decision to transfer the Plaintiff and her colleagues by stating that

he was "not going to allow the safety of [the Plaintiff's colleagues who remain in the Air

Wing] to be compromised or allow anyone to relive the horrific tragedies of the past."

Colonel Foley made these remarks, directly implying that the Plaintiff was an unsafe pilot, while knowing that the Plaintiff had a well-established safe, competent flying record and that she was never in any way involved in any "tragedies." (Amended Complaint, ¶ 43k, Exhibit 5, page 3 of Copy of Message from the Colonel).

On or about May 19, 2004, Major Thomas R. McGilvray, Deputy Commander of Standards for the MSP, sent the Plaintiff a memorandum notifying her that she was the subject of an internal investigation "in regards to the truthfulness of statements that [the Plaintiff] made during interviews regarding the complaint that [she] filed with the Harassment Investigation Unit against Lieutenant Michael Barry."  Major McGilvray advised the Plaintiff in his letter of May 19, 2004 that "the investigation also concerns the truthfulness of entries made into [the Plaintiff's flight] logbook … that reflects the flights from 1993 through 2001." (Amended Complaint ¶ 43m, Exhibit 6, copy of May 19, 2004 Notification of Internal Investigation).  On April 27, 2005, the MSP announced the Plaintiff's prospective eighteen month suspension from her employment with the MSP and a prospective action to bar her from ever returning to work for the MSP Air Wing.  (Amended Complaint ¶ 43n).

Finally, on October 21, 2005, in an unprecedented move, the Defendant court-martialed the Plaintiff, imposing on her a thirteen month unpaid suspension and recommended permanently banning her from ever operating any aircraft for the MSP.  Exhibit 7, Disciplinary Action and Trial Board Findings dated October 21, 2005.  This disparately severe punishment was ostensibly imposed for an inaccurate flight log book entry on a single date and for Plaintiff answering at first untruthfully and subsequently truthfully inappropriate and irrelevant questions regarding her personal life that Defendants improperly subjected her to when they were supposed to be investigating a complaint of sexual harassment that the

Plaintiff herself made.  Exhibit 7.  The Plaintiff remains a licensed pilot and the FAA has not

deviated from its previous rejections of the MSP's repeated attempts to have her license

revoked.  See Exhibits 2 and 3, the two letters from FAA Legal Counsel to the MSP's Chief

Legal Counsel.   In short, the thirteen month suspension punished the Plaintiff for being the

first female MSP pilot, complaining of the sexual harassment and disparate treatment she

suffered in the course of achieving this accomplishment, and having the temerity to publicly

persist in prosecuting these complaints.

## III.    Argument

A court may not order the dismissal of the plaintiff's complaint unless it appears

beyond a doubt that the [plaintiff] can prove no set of facts in support of [his] claim which

would entitle [him] to relief."  Feliciano v. State of Rhode Island, 160 F 3d 780, 788 (1st Cir.

1998).  The Defendant is not entitled to have Count IV of the Plaintiff's Amended Complaint

dismissed as waived by Plaintiff's prior action in state court because Count IV of Plaintiff's

Amended Complaint specifically alleges claims arising from numerous retaliatory acts that

are separate and distinct from the single act alleged by her previous state court action.  At

most, an employee who brings suit under the Whistleblower Act waives only those rights and

remedies arising from the employer's **same** retaliatory actions "under any other contract,

collective bargaining agreement, state law, rule or regulation, or under the common law."

Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 194 (D. Mass. 2005) (Young, C.J.), citing

Mass. Gen. L. c. 149 Sec. 185(f) and Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 220-

221 (D. Mass. 2002) (Ponsor, J.) (emphasis added).

The inaccuracy of Defendant's claim that the retaliatory acts alleged in the state action

are the "same" as the retaliatory acts alleged in Count IV of this federal action is plain from

the face of the two complaints in question.  Plaintiff's state action alleged only one retaliatory act:  the temporary transfer of Plaintiff from her Air Wing unit.  Count IV of the Plaintiff's Amended Complaint alleges retaliatory claims that are specific to Massachusetts General Law c. 151B and that arise from at least twenty-four other distinct retaliatory acts alleged in the Amended Complaint, including, but not limited to:  (i) conducting an improper and retaliatory investigation of her complaints of gender discrimination and sexual harassment, (ii) assigning the Plaintiff, a licensed commercial helicopter pilot, to the Motor Vehicle Regulatory Section, (iii) repeatedly contacting the FAA and requesting that it revoke her pilot's license, culminating in (iv) an 18 month suspension and (v) seeking to permanently bar the Plaintiff from ever working again in the Air Wing Unit.  Additionally, Defendants just completed the investigation it notified the Plaintiff of in May, 2004 (Exhibit 6, May 19, 2004 Notification) and on October 21, 2005 subjected her to an unprecedented thirteen month unpaid suspension. Plaintiff cannot have waived her rights and remedies for acts she did not allege nor acts that did not yet occur, and for which she did not seek remedy for or relief from in the state action, regardless of the standard used to define the scope of any purported waiver.

**A.  Plaintiff's Prior State Action is limited to a single retaliatory act and does not include the retaliatory acts alleged in Count IV of the Amended Complaint**

The sole retaliatory act alleged on the Plaintiff's behalf in the state Whistleblower action is that the Defendant unilaterally transferred her out of the Air Wing unit.  No other retaliatory act is described or alleged.  In addition, a number of the retaliatory acts alleged in the Plaintiff's Amended Complaint had not yet occurred at the time she joined in the state action, and one, the thirteen month unpaid suspension, only occurred on October 21, 2005.

**B.  Plaintiff's Amended Complaint alleges numerous retaliatory acts that are not alleged in her prior state action**

Plaintiff's Amended Complaint, on the other hand, specifically describes numerous retaliatory acts for which she seeks relief that are not included in her prior state action. Count IV of her Amended Complaint repeats and realleges Paragraphs 1 through 62 of the Amended Complaint in which she describes in detail a number of discrete and serious discriminatory and retaliatory actions that are not included in her complaint in the prior state whistleblower action. Count IV identifies at least twenty-four other instances and specific circumstances of retaliation:

1. Failing to properly investigate Plaintiff's complaints of sexual harassment (Amended Complaint ¶12 and 13)

2. Conducting more than one improper, retaliatory and punitive investigation of Plaintiff's complaints (Amended Complaint ¶ 12, 13 and 43a)

3. Actively and repeatedly on a number of occasions trying to get the FAA to revoke the Plaintiff's commercial helicopter pilot's license, despite the FAA's rebuffs. (Amended Complaint, ¶. 25a and 25j.

4. In response to Plaintiff's May 2003 internal complaint, Lt. Colonel Oscar Langford visiting the Air Wing and announcing to all present at an Air Wing Staff meeting that the Air Wing had become an embarrassment and threatening to transfer those who complained (Amended Complaint ¶ 43b)

5. Refusing to acknowledge the FAA's statements that the Plaintiff's licenses were valid. (Amended Complaint ¶25j)

6. Refusing to address threats and insults the Plaintiff received from the wife of a person Plaintiff complained of in her complaint to MCAD. (Amended Complaint, ¶43d)

7. On January 25, 2004, two superior ranking troopers confronting the Plaintiff with a copy of her MCAD charge of discrimination, trying to get her to state that she was too emotionally distraught to fly, and telling her they would discuss her emotional fitness to fly with the Colonel (Amended Complaint ¶ 43e).

8. A Trooper circulating on or about February 17, 2004 a copy of the same MCAD charge to personnel at the MSP's Westover and Plymouth Air Wings. (Amended Complaint ¶43g)

9. Captain Concannon's report issued on or about February 29, 2004, blaming various problems on Plaintiff's complaints of sexual harassment and recommending that the

Plaintiff be removed from the Air Wing while her MCAD charges were pending (Amended Complaint, ¶43h.

10. On or about March 3, 2004, involuntarily transferring the Plaintiff, a validly trained and licensed commercial helicopter pilot, to the Motor Vehicle Regulatory Section (Amended Complaint ¶43j.

11. In a May, 2004 Massachusetts State Police newsletter, Defendant Colonel Thomas Foley publicly disparaging the Plaintiff and injuring her reputation as a competent and safe pilot (Amended Complaint, ¶ 43k).

12. On or about May 19, 2004, initiating an internal investigation of the Plaintiff regarding statements she made during the internal investigation of her complaint of sexual harassment as well as entries made in her flight logbook for flights from 1993 through 2001 (Amended Complaint ¶ 43m).

13. On April 27, 2005, the Massachusetts State Police announcing the Plaintiff's prospective eighteen month suspension from her employment with the MSP as well as a prospective action to bar her from ever returning to work for the MSP Air Wing (Amended Complaint, ¶25a and 43n)

14. That the Defendant's acts of retaliation against the Plaintiff were willful and deliberate (Amended Complaint Count IV, ¶69).

15. That the Defendant subjected the Plaintiff to undue scrutiny and unfair criticism (Amended Complaint Count IV, ¶71)

16. Falsely accusing the Plaintiff of improperly obtaining her helicopter pilot's license (Amended Complaint Count IV, ¶71)

17. Causing the Plaintiff to suffer a loss of opportunities to advance her career (Amended Complaint Count IV, ¶71);

18. Subjecting the Plaintiff to undue hostility from supervisors and colleagues (Amended Complaint Count IV, ¶71);

19. Subjecting the Plaintiff to unfair and unwarranted disciplinary action, including having undeserved charges filed against her (Amended Complaint Count IV, ¶71)

20. Subjecting the Plaintiff to a hostile and offensive work environment , (Amended Complaint Count IV, ¶71)

21. Causing the Plaintiff to experience emotional distress, humiliation, and mental anguish (Amended Complaint, Count IV, ¶71)

22. That the Defendant subjected the Plaintiff to false accusations, damaging her reputation (Amended Complaint, Count IV, ¶71)

23. That the Defendant denied the Plaintiff the opportunity to practice her chosen profession (Amended Complaint, Count IV, ¶ 71);

24. That the Defendant caused the Plaintiff to lose substantial experience in her chosen profession, damaging her future job prospects. (Amended Complaint Count IV, ¶71.

   The numerous retaliatory acts and specific circumstances listed above are all alleged or realleged in Count IV of the Plaintiff's Amended Complaint.  None were complained of or alleged in the Plaintiff's prior state action.  Several occurred after the state action was filed, the most recent being the Defendants' imposition on the Plaintiff in October of 2005 of a thirteen month unpaid suspension.  Only a single retaliatory action was alleged in the prior state action:  the transfer of the plaintiff from the Air Wing.  The Plaintiff cannot have waived her rights and remedies for the other claims of retaliation that only appear in Count IV, because Plaintiff cannot have waived her rights and remedies for acts she did not allege, and for which she did not seek remedy for or relief from, in the state action, regardless of the standard used to define the scope of any purported waiver.

### C.  At most, any waiver only applies to claims arising from the same retaliatory acts

   In Haddad v. William Scanlon (1999 Mass. Super. Lexis 272), the Massachusetts Superior court held that the employee had "at most" waived claims that arose from a single, common act of retaliation.  Bennett v. City of Holyoke, et al. 230 F. Supp. 207, 220 (D. Mass. 2002), describing the scope of the waiver found by Haddad.   "An employee may, however, pursue any contractual, common law, or other statutory claim that is sufficiently distinct from the discharge claim."  Haddad at Lexis *9.  The court in Haddad dismissed only those claims that arose "solely out of the termination" of the employee, the one retaliatory act alleged, and declined to waive any claim where the Plaintiff had "…alleged conduct independent of the

discharge …" Haddad at Lexis *9.  Here, Plaintiff Jody Reilly has alleged in Count IV of her

Amended Complaint at least twenty-four instances of retaliatory acts independent of the

temporary transfer from the Air Wing.  Additionally, a further act of retaliation just occurred

on October 21, 2005.

　　　　In Bennett, the court acknowledged that "very little decisional law has illuminated the

meaning and scope of this waiver provision since the statute's passage," Id. at 220, and held

that "The Whistleblower Statute was obviously designed to broaden protection to vulnerable

workers, not to force them to jettison legitimate independent claims."  Id. at 220-221.   In

evaluating waiver where a Plaintiff claimed retaliation under both c.151B and the

Whistleblower Act for the same retaliatory acts, the Bennett court further criticized the

Defendants for their "… overly expansive "waiver" hypothesis regarding the effect of

invoking the Commonwealth's Whistleblower statute."  (Bennett at 222)

　　　　**At most,** an employee who brings suit under the Whistleblower Act waives only those

rights and remedies arising from the employer's **same** retaliatory actions "under any other

contract, collective bargaining agreement, state law, rule or regulation, or under the common

law." Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 194   (D. Mass. 2005) (Young, C.J.),

citing Mass. Gen. L. c. 149 Sec. 185(f) and Bennett v. City of Holyoke, 230 F. Supp. 2d 207,

220-221 (D. Mass. 2002) (Ponsor, J.) (emphasis added).  Since the only retaliatory act alleged

that is the same in both Count IV of the Amended Complaint and the state Whistleblower

action is the temporary transfer of the Plaintiff out of the Air Wing Unit, then at most Plaintiff

has only waived her rights and remedies arising from that one act.

　　　　**D.  Even the single retaliatory act common to both the state action and Count IV
　　　　　　of the Amended Complaint should not be dismissed**

With respect to the one retaliatory act that Plaintiff's Amended Complaint and her state action both allege, the Defendant's involuntary transfer of her from the Air Wing, the Court may not proceed to apply any waiver unless the claims to be waived also "…may actually be pursued substantively via the Whistleblower Statute.  …if a claim cannot be pursued … the waiver provision cannot be invoked to bar the claim…" <u>Bennett</u> at 221.

In <u>Bennett</u>, the court was able to determine whether the claim in question could be substantively pursued via the Whistleblower statute because the Plaintiff was alleging retaliation claims under both the Whistleblower Statute and Mass. Gen. L. c.151B in the same suit before that court.  Here, Plaintiff Jody Reilly's Whistleblower claim is part of a separate suit filed in another court.  Her ability to substantively pursue in that court her claim of retaliation for the temporary transfer out of the Air Wing Unit may be barred or impeded, or may even be withdrawn by the Plaintiff herself.  In <u>Bennett</u>, the court went on to find that, although Plaintiff had waived a claim of retaliation against the Defendant City of Holyoke by making claims under both c. 151B and the Whistleblower Act for the same two retaliatory acts of discipline (<u>Bennett</u> at 220), the waiver was not effective and Plaintiff could proceed with his claim under c. 151B because his Whistleblower claim was barred due to his failure to satisfy certain procedural requirements of the Whistleblower Act.  <u>Bennett</u> at 222.  Here, the state action is pending and the court does not have before it both the Whistleblower and the c. 151B retaliation claims.  This court cannot therefore make a dispositive determination as to the scope or effectiveness of any purported waiver.

### IV.  Conclusion

The Plaintiff's claims for Retaliation in Violation of Massachusetts General Laws Chapter 151B, § 4 (4), (4A), (5) in Count IV of the Amended Complaint must survive the

Defendant's motion to dismiss, as the allegations alleged and realleged in Count IV, and all reasonable inferences that may be drawn from them, show that (a) Count IV alleges numerous acts of retaliation not alleged in, and in several instances occurring after, the single retaliatory act alleged in Plaintiff's prior state action, (b) a recent act of retaliation that would also support Plaintiff's claims in Count IV just occurred on October 21, 2005, and (c) with respect to the single retaliatory act common to both Count IV of the Amended Complaint and Plaintiff's prior state action, it cannot at this time be determined whether that claim may actually be pursued substantively via the Whistleblower Statute.

### REQUEST FOR ORAL ARGUMENT

**The Plaintiff respectfully requests a hearing before the Court to present an oral argument in support of her Opposition to the Defendant's Motion.**

Respectfully submitted,
JODY REILLY,
By her Attorney,


/s/ Scott W. Lang
Scott W. Lang, Esquire  BBO #285720
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA  02740
(508) 992-1270

Dated:  November 29, 2005


### CERTIFICATE OF SERVICE

I certify that on this 29th day of November 2005 I served the above document on counsel for the Defendant, Maite A. Parsi, Assistant Attorney General, Office of the Attorney General, Government Bureau, One Ashburton Place, Room 1813, Boston, MA 02108, by regular mail, postage prepaid, and by electronic filing.


/s/ Scott W. Lang
Scott W. Lang, Esquire



*The Commonwealth of Massachusetts*
*Department of State Police*
*Office of the Chief Legal Counsel*
*470 Worcester Road*
*Framingham, MA 01702*
*(508) 820-2311*

JANE SWIFT
*GOVERNOR*

JAMES P. JAJUGA
*SECRETARY*

COLONEL THOMAS J. FOLEY
*SUPERINTENDENT*

August 5, 2002

Christopher Poreda, Esq.
FAA Office of Regional Counsel
12 New England Executive Park
Burlington, MA 01803

Re:    Request to Review Trooper Reilly's Commercial Pilot Certification

Dear Attorney Poreda:

I am writing in response to our telephone discussion on July 29, 2002. As we discussed, the Massachusetts State Police ("MSP") has an outstanding issue regarding the certification as a commercial pilot with a rotorcraft category and helicopter class rating of Trooper Jody Reilly. In an oversimplification, it appears that Trooper Reilly was issued the above-mentioned commercial pilot certificate on 9/10/01, without completing the requirements of 14 Code of Federal Regulations ("CFR") § 61.129, "Aeronautical Experience," for that certificate. We are in agreement that there is no wrongdoing on the part of Trooper Reilly.

My assessment after reviewing the applicable CFRs is that it appears that Trooper Reilly should have been issued the **private** pilot certification with a rotorcraft category and helicopter class rating rather than the **commercial** pilot certification. The private pilot certification only requires 40 hours of flight time that includes at least 20 hours of flight training and 10 hours of solo flight time in a helicopter. My understanding is that federal form 8710 indicates that Trooper Reilly met the required 10 hours of solo flight time in a helicopter by logging about 11.5 solo flight hours. However, approximately 11.5 solo flight hours alone is not enough to fulfill the commercial pilot certification requirement of 35 hours of pilot-in-command ("PIC") time.

If Trooper Reilly had received the private pilot certification with helicopter rating on 9/10/01, she would have been able to log helicopter pilot-in-command ("PIC") time after that date towards a commercial pilot certification by either: 1) flying solo in a helicopter; or 2) solely manipulating the controls of the helicopter - allowed because she is rated for flying helicopters. *See* 14 CFR § 61.51(e).

*Excellence In Service Through Quality Policing*

However, the FAA inspector who certified her, counted time Trooper Reilly flew in a helicopter with her instructor, although she was not rated for helicopter, as PIC time. In doing so, it is my understanding he relied on 14 CFR § 61.31(d), which sets forth:

(d)    Aircraft category, class, and type ratings:
Limitations on operating an aircraft as the pilot in command. To serve as the pilot in command of an aircraft, a person must –
(1)    Hold the appropriate category, class, and type rating (if a class rating and type rating are required) for the aircraft to be flown;
(2)    **Be receiving training for the purpose of obtaining an additional pilot certificate and rating that are appropriate to that aircraft, and be under the supervision of an authorized instructor; or**
(3)    Have received training required by this part that is appropriate to the aircraft category, class and type rating (if a class or type rating is required) for the aircraft to be flown, and have received the required endorsements from an instructor who is authorized to provide the required endorsements for solo flight in that aircraft.

The interpretation of this section is addressed in a document by the FAA titled "Frequently Asked Questions 14 CFR, Part 61." It appears that "serving as PIC" differs from what can be "logged" as PIC time. Section 61.51(e) governs the logging of pilot-in-command time. The above section is inapplicable to the logging of PIC time. At the bottom of page 2 of the attached "Frequently Asked Questions," this exact situation is addressed:

QUESTION: I am [a] private pilot with an airplane single engine land rating. I am seeking to add a helicopter rating. Can I log the time as PIC while manipulating the controls with my instructor on board as in § 61.31(d)(2)?

ANSWER:    No. You cannot log the time as PIC while his instructor is on board since you are not rated in the aircraft. See § 615(e)(1)(i). There is nothing wrong with the way § 61.31(d)(2) has been written. To "serve" as the pilot in command while receiving training does not authorize logging PIC. There has always been a difference between logging PIC time vs. acting/serving as PIC. {Q&A – 146}

In addition, the last page also establishes that logging PIC time based on being the "sole manipulator" of the controls requires that you be rated for the aircraft you are flying – in this case, a helicopter. Specifically the Office of the Chief Counsel of the FAA sets forth:

14 CFR section 61.51(e) governs the logging of pilot-in-command time. This section provides, in pertinent part, that a private pilot may log pilot-in-command time for that flight time during which that person is the sole manipulator of the controls of an *aircraft for which the pilot is rated*.

The MSP has instituted high standards for its pilots to ensure safety to themselves and the public. I have been informed that no other members of the MSP Air Wing has had § 61.31(d) applied

*Excellence In Service Through Quality Policing*

such that they could log as PIC time, helicopter flight time with an instructor while not rated for helicopter.

It is important to the MSP that all its pilots are properly certified as commercial pilots. It is my understanding that currently the regulations are being interpreted consistent with the responses in the "Frequently Asked Questions," set forth above, i.e. that one cannot log PIC hours with an instructor on board unless the pilot is rated for the aircraft – in our case, helicopter. In terms of Trooper Reilly, it appears she would not have been certified as a commercial pilot if her 9/10/01 testing occurred today.

In our telephone conversation we discussed how best to alleviate any concerns regarding Trooper Reilly's commercial pilot certification while minimizing unnecessary inconvenience to all parties, especially Trooper Reilly who is caught in the middle through no fault of her own. In accordance with that discussion, the MSP requests that the FAA review Trooper Reilly's log (attached) and verify to the MSP in writing whether she currently has logged the required PIC hours and other hours set forth in § 61.129(c) for certification as a commercial pilot with a rotorcraft category and helicopter class rating in accordance with the regulations as they are currently interpreted.

In addition, I would greatly appreciate if you could provide information on when and why the interpretation of the regulations were read differently on 9/10/01 than they are currently.

Thank you for your time and assistance in this matter.

Very truly yours,

Eleanor C. Sinnott
Chief Legal Counsel

cc:    Lt. Colonel Bradley G. Hibbard
       Lt. Colonel John D. Kelly
       Lt. Colonel John F. Caulfield

*Excellence In Service Through Quality Policing*

U.S. Department
of Transportation
Federal Aviation
Administration

New England Region
Office of the Regional Counsel

12 New England Executive Park
Burlington, MA  01803-5299

Christopher Poreda
Tel. 781-238-7042
Fax. 781-238-7055

July 21, 2003

Ms. Eleanor Sinnott, Chief Legal Counsel
Massachusetts State Police
470 Worcester Road
Framingham, MA 01702

Dear Ms. Sinnott:

<u>Request for Review of Trooper Reilly's Certification</u>

I have reviewed your letter of August 5, 2002, requesting that this office verify that
when Trooper Jody Reilly received her helicopter rating she had the requisite
aeronautical experience for that rating under the Federal Aviation Regulations.  I have
reviewed the applicable regulations; the copies of Trooper Reilly's pilot logbooks that
you provided to us; a copy of Trooper Reilly's Application for Certificate or Rating,
FAA Form 8710-1, that she completed prior to taking the practical exam for her
helicopter rating; and FAA Order 8700.1, the Operations Inspectors Handbook.

I find that in September 2001 Trooper Reilly presented herself to an FAA Aviation
Safety Inspector (ASI) for a practical exam for a commercial pilot certificate with a
helicopter rating.  Michael P. Melia, a certified flight instructor, endorsed Trooper
Reilly to take that exam, stating that he had personally instructed Trooper Reilly and
considered her ready to take the test.  I understand that at the time of the exam
Mr. Melia was also a member of the State Police Air Wing.  As is required by the
Operations Inspectors Handbook, the ASI determined that she possessed the necessary
aeronautical experience.  The ASI then administered the practical exam and issued to
Trooper Reilly a commercial pilot certificate with a helicopter rating.

I therefore conclude that Trooper Reilly's commercial pilot certificate with helicopter
rating was properly issued.  If you would like to me to provide the regulatory analysis
for my conclusion, please let me know.

Sincerely,

Christopher Poreda
Acting Regional Counsel

of Transportation
Federal Aviation
Administration

Office of the Regional Counsel

Burlington, MA 01803-529

Christopher Poreda
Tel. 781-238-7042
Fax. 781-238-7055

July 28, 2003

Ms. Eleanor Sinnott, Chief Legal Counsel
Massachusetts State Police
470 Worcester Road
Framingham, MA 01702

Dear Ms. Sinnott:

### Request for Review of Trooper Reilly's Certification

In our telephone conversation following your receipt of my letter of July 21, 2003, you requested that I provide a more detailed analysis for my conclusion that Inspector William Wicks of the Boston Flight Standards District Office properly issued Trooper Reilly's helicopter certificate in September 2001. As you stated in your original request, and reiterated a few days ago, you would like me to address the disparity between the interpretation of the regulations applied by Inspector Wicks with respect to Trooper Reilly's aeronautical experience, and the guidance available on the FAA's internet site in the form of answers to "Frequently Asked Questions." At issue is what amount of the flight time that Trooper Reilly accumulated during her flight training to prepare for the helicopter practical exam should have been viewed as "pilot in command" (PIC) time.

Part 61 of the Federal Aviation Regulations (14 CFR part 61) contains the rules that govern this issue. As you note in your original request, the FAA has separated the concept of "acting" or "serving" as the pilot in command of an aircraft from when pilots may "log" flight time as PIC. This results in situations where both pilots on board an aircraft may legitimately may log the flight time as PIC, even though in reality only one is the actual PIC, having the final authority and responsibility for the operation and safety of the flight. These rules, however, have been interpreted differently within the aviation community. The question then narrows to whether Inspector Wicks was reasonable in his interpretation of the rules at the time of the exam. I believe Inspector Wicks was reasonable in his application of the rules to Trooper Reilly's situation.

When a pilot who already holds a certificate undergoes training for an additional category or class rating, that pilot may not operate an aircraft in that new category or class without an authorized instructor pilot on board. Generally, § 61.31(d) provides that no person may serve as PIC without holding the appropriate category and class rating for the aircraft to be flown. An exception to that general rule applies when the pilot receives "training for the purpose of obtaining an additional pilot certificate and

OFFICIAL FILE COPY

rating that are appropriate to that aircraft, and [is] under the supervision of an authorized instructor." §61.31(d)(2). Thus, the pilot-in-training may "act" as PIC only if the instructor is on board the aircraft for that operation. When the instructor issues the pilot a "solo endorsement" for training purposes the pilot may operate the aircraft without the instructor. §61.31(d)(3).

Section 61.51(d) governs when that pilot may log that training time as PIC. No one disputes that if the pilot-in-training is the sole occupant of the aircraft, after having received a solo endorsement, the pilot-in-training may log that solo time as PIC. At the time of Trooper Reilly's practical exam legitimate debate existed, though, over whether a pilot-in-training can log time flown with an instructor as PIC time. One view, taken by Inspector Wicks, sees the instructor as required to be on board the aircraft, and, therefore, §61.51(e)(1)(iii) allows the pilot-in-training to log the training time as PIC time. Section 61.51(e)(1)(iii) allows a pilot who holds a certificate, but who is operating an aircraft for which that pilot is not rated, to log flight time as PIC if the "regulations under which the flight is conducted" require more than one pilot to be on board the aircraft.

The preamble to the most recent comprehensive changes to Part 61, and the text of other rules in Part 61, support this interpretation. In 1995, the FAA proposed to eliminate the distinction between "acting" as PIC and "logging" PIC time, and establish a regulatory scheme under which generally only one pilot, the pilot with authority over the flight, could log PIC time. But, the FAA also proposed a new rule that would have specifically allowed that "when a flight instructor and a certificated pilot are on board the aircraft at the same time, each may log pilot in command flight time." While the proposed changes were not adopted, the FAA acknowledged that the existing rule, which continues in place, allows instructors to log PIC time for instructional flight time and other pilots to log PIC time for the same flight time if the regulations under which the flight was conducted required more than one pilot. 62 Fed.Reg. 16247-16250, "Section 61.51 Pilot Logbooks". Thus, the FAA recognized that the existing rules allow a pilot-in-training to log PIC time and even when proposing a significant change to those rules, was prepared to continue that concept under the new regulatory scheme.

In addition, §61.129 contains potentially conflicting requirements if pilots-in-training are not permitted to log PIC time for the flight time with an instructor. In the case of Trooper Reilly, for example, §61.129 required a minimum of 35 hours of PIC time in helicopters and a minimum of 10 hours of solo PIC time in helicopters. §61.129(c)(2). If Trooper Reilly could only log PIC time as the sole occupant of the aircraft, §61.51(e)(1)(ii), then §61.129 would, in effect, require a minimum of 35 hours of solo time instead of only 10 hours of solo time. Since the general rules of regulatory interpretation favor avoiding constructions that create internal conflicts within a regulation, the interpretation used by Inspector Wicks was both consistent with past policy and reasonable.

On the other hand, you point to a document entitled "Frequently Asked Questions" (FAQ) that provides some guidance about Part 61. That document takes the view that in some circumstances a pilot-in-training may not log so-called "dual" training time as

OFFICIAL FILE COPY

PIC time. Though that document appears on the FAA's internet site, it contains a disclaimer that the guidance provided does not constitute a legal interpretation of the rules and may not have been reviewed by the FAA's Office of Chief Counsel. In September 2001, the specific guidance to which you point, Q&A 146, was still the subject of debate within the FAA, and does not specifically answer the question about whether an instructor may be viewed as a required pilot. Trooper Reilly's circumstances caused the Office of Chief Counsel and the Flight Standards Service to examine this issue and the guidance contained in the FAQ document as it relates to the logging of PIC time in a training context.

While the Flight Standards Service affirmed the guidance in the FAQ document on the question of logging PIC time in a training context, it also recognized that the guidance had not been universally applied. The New England Region was delegated the task of determining if any further actions in Trooper Reilly's situation were warranted. The New England Region determined that while we will apply the guidance contained in the FAQ on this issue for future examinations, retroactive application of that guidance is neither required nor reasonable. That determination is also consistent with FAA's position in the Part 61 final rule where, in light of inconsistent prior interpretations of existing rules, any "clarification is meant to be prospective and not to require pilots to 'revisit' past logging." 62 Fed.Reg. 16249, 3rd column, "FAA Response." Therefore, the New England Region Flight Standards Division acted within its discretion to accept Inspector Wick's determination in September 2001 that Trooper Reilly could count training time as PIC time on her application.

Accordingly, Inspector Wicks acted reasonably in concluding that an instructor was required to be on board the aircraft, and, therefore, that the pilot-in-training could log that training time as PIC time. I find that he acted properly in issuing a commercial helicopter certificate to Trooper Reilly.

Sincerely,

Christopher Poreda
Acting Regional Counsel

File: Ltrs/Sinnott
WP: G:\GROUPS\LEGAL\CZPDOCS\LTRS\Sinnott02.doc
CZP:C.Poreda:CZP:781.238.7042:07/25/2003

OFFICIAL FILE COPY

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                    SUPERIOR COURT DEPARTMENT
                                 CIVIL ACTION NO.



JOSEPH GURA, GALE MACAULAY,          )
JODY REILLY, and SHAWN CAMPINHA,     )
        Plaintiffs                   )
                                     )        04-1654
V.                                   )
                                     )
THOMAS FOLEY, as Colonel of the      )        FILED
Commonwealth of Massachusetts        )    IN THE OFFICE OF THE
DEPARTMENT OF STATE POLICE,          )        ...CTS
        Defendants                   )      APR 20 2004
                                     )
                                              CLERK

COMPLAINT AND DEMAND FOR JURY TRIAL

04/20/04 10:09#0000 6109 CLERK E
                                    40      240.00
## INTRODUCTION                   CIVIL     960.00
                                    SURCHARGE  15.00
1.    This action is brought on behalf of four State Police Troopers who have suffered SUMMONS    5.00
adverse employment action as a result of their protected action as "whistleblowers". SECC    20.00
                                    041654 #
## PARTIES                          SUBTTL   1000.00
                                    TOTAL
2.    Joseph Gura is an individual residing in Hampshire County, Massachusetts.  1000.00
                                    CHECK    1000.00
3.    Gale MacAulay is an individual residing in Plymouth County, Massachusetts.

4.    Jody Reilly is an individual residing in Barnstable County, Massachusetts.

5.    Shawn Campinha is an individual residing in Plymouth County, Massachusetts.

6.    The Department of State Police is an agency of the Commonwealth of
Massachusetts established by Mass. G.L. ch. 22c.

## JURISDICTION

7.    This Court has jurisdiction over this matter in accordance with M.G.L. ch. 149,
§ 185.

FACTS

8.    Prior to February 29, 2004, Plaintiff's Joseph Gura ("Gura"), Gale MacAulay ("MacAulay"), Jody Reilly ("Reilly") and Shawn Campinha ("Campinha") were assigned to the State Police Air Wing ("Air Wing"). MacAulay and Reilly are the only female members of the State Police Air Wing.

9.    In May 2003, Reilly filed a letter of complaint with the State Police Harassment/Sexual Harassment Unit. She alleged that she had been subjected to unwarranted sexual advances by the unit commander, discriminated against based upon her gender, and subjected to a hostile work environment in violation of law.

10.   In or about January 2004, Reilly filed a complaint with the Massachusetts Commission Against Discrimination, which is currently pending (Docket Number 04BEM00100). Details of her complaint were described in a newspaper article appearing in the Boston Globe on January 20, 2004.

11.   On November 18, 2003, Campinha and MacAulay flew a helicopter mission that involved flying Boston Police photographers over the City of Boston.

12.   On November 20, 2003, Campinha and MacAulay were informed that they were being investigated for an alleged unsafe helicopter landing procedure, during the November 18, 2003 mission, and were requested to submit a report.

13.   MacAulay and Campinha submitted reports on November 24, 2003. After submitting their reports, they were informed that they were "grounded" (prohibited from flying) until further notice.

14.   Campinha and MacAulay appealed this order in accordance with M.G.L. ch. 22c, § 43, which provides an administrative appeal for any department member aggrieved by an order of the Colonel or his designee.

15.   On December 11, 2003, the § 43 appeal hearing was conducted by Lieutenant Colonel John Caulfield. Campinha and MacAulay testified that their landing procedure was appropriate and not unsafe. They further testified that several other members of the Air Wing had performed unsafe maneuvers, and had not been "grounded" or re-trained. These other incidents included officers flying too low causing a woman to fall off a horse, landing too closely to a baby carriage that was blown away, and another officer causing damage to an aircraft.

16.   Testifying on behalf of Campinha and MacAulay were Joseph Gura, who was their union "Barracks" representative, and Sergeant Chuck Atchison, another member of the Air Wing.

17.   Gura and Atchison confirmed Campinha and MacAulay's assertion that there existed serious safety concerns with some members and practices within the Air Wing.

18.   On December 12, 2004, the day after the § 43 hearing, the Defendant transferred Captain Michael Concannon ("Concannon") to the Air Wing as the new unit commander. Campinha and MacAulay's § 43 appeal was denied, and they sought further appellate review in Superior Court which remains pending (Suffolk Superior Court, Civil Action No. 04-0648H).

19.   Concannon was informed the Air Wing had some "on-going issues" that needed to be resolved to ensure that the aircraft and missions would be conducted safely.

20   To achieve this, Concannon "informally" interviewed all members of the Air Wing, and compiled a report and recommendations.

21.   This report, dated February 29, 2004, purportedly summaries opinions and quotes from unidentified members of the Air Wing.

22.   Concannon's final recommendation was to remove from the Air Wing those officers that had pending legal matters with the Department (Reilly, Campinha, MacAulay) and those that testified on their behalf (Gura, Atchison).

23.   Defendant Foley adopted this recommendation, and unilaterally transferred these officers from the Air Wing.

### COUNT 1 – M.G.L. CH. 149, § 185 (JODY REILLY)

24.   Reallege and incorporate paragraph 1 through 23 above.

25.   M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

26.   Plaintiff Jody Reilly provided testimony regarding a violation of law by Defendant's employee, to the employer, and to the MCAD.

27.   The Defendant transferred Plaintiff Reilly in retaliation for her ongoing litigation.

### COUNT II - M.G.L. CH. 149, § 185 (SHAWN CAMPINHA)

28.   Reallege and incorporate paragraph 1 through 27 above.

29.   M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

30.   Plaintiff Campinha provided testimony regarding policies of the Air Wing that he believes pose a risk to public health and safety.

31.     The Defendant transferred Plaintiff Campinha in retaliation for his testimony and ongoing litigation.

### COUNT III - M.G.L. CH. 149, § 185 (GALE MACAULAY)

32.     Reallege and incorporate paragraph 1 through 31 above.

33.     M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

34.     Plaintiff MacAulay provided testimony regarding policies of the Air Wing that she believes pose a risk to public health and safety.

35.     The Defendant transferred Plaintiff MacAulay in retaliation for her testimony and ongoing litigation.

### COUNT IV - M.G.L. CH. 149, § 185 (JOSEPH GURA)

36.     Reallege and incorporate paragraph 1 through 35 above.

37.     M.G.L. ch. 149, § 185 provides a cause of action for employees who are illegally retaliated against.

38.     Plaintiff Gura provided testimony regarding policies of the Air Wing that he believes pose a risk to public health and safety.

39.     The Defendant transferred Plaintiff Gura in retaliation for his testimony and ongoing litigation.

WHEREFORE, Plaintiffs pray that judgment be entered on their behalf, and further that:

1.    Defendant reinstate Plaintiffs to the State Police Air Wing;
2.    The Defendant compensate Plaintiffs for three time lost wages and other damages, together with interest thereon;
3.    The Defendant be ordered to pay Plaintiffs costs and legal fees associated with this action; and
4.    Such other relief as the Court deems necessary and proper.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL TRIABLE COUNTS.

Respectfully submitted,
For Plaintiffs,
By their attorneys,

LAW OFFICES OF TIMOTHY M. BURKE

Scott W. Dunlap, Esquire
BBO# 634389
Timothy M. Burke, Esquire
BBO# 065720
160 Gould Street, Suite 111
Needham, Massachusetts 02494
(781) 455-0707



# French and Electric Blue

### Newsletter of the Massachusetts State Police

**May 2004**

# Message from the Colonel

I want to take this opportunity to thank all of you for your support during my two and one half years as your Superintendent. It has been an honor for me to serve in this position and I am extremely grateful to have had this opportunity. Serving as your Superintendent has been a humbling experience and a responsibility I took very seriously. For this reason I believe I owe you all an explanation for my decision to retire at this time.

This decision has been very difficult for both Lt. Col. Brad Hibbard and myself, as neither of us had planned on retiring at this time. Due to circumstances that have developed, we feel it is in the best interest of the Department that we step aside. It is much more important that the Department's mission to provide the highest level of service that the public deserves and which each and every one of us has sworn to provide takes precedence over our personal careers. It is readily apparent to us that the best interests of the Department have become secondary to the personal and individual needs of an influential few within the Department. The time has come for the dedicated professionals that make up the vast majority of this Department to take notice of the direction in which this vocal group of individuals with personal agendas is leading them.

Lt. Col. Hibbard and I have worked with many of you over the course of our careers. Many members of the Department claim to have the best interests of the job and its personnel at heart; fortunately, most members demonstrate their interests through actions. Both Lt. Col. Hibbard and I have served in supervisory positions including Patrol Supervisor, Station and Section Commander, Troop Commander, and our most recent positions. While in these positions we have always endeavored to treat those who have worked for us in a fair and respectful manner while at the same time protecting the interests of the Department. Those who

have worked for and with us will agree. The challenges of supervision are both demanding and rewarding at the same time. We have tried our best to be supportive of your efforts and to show our concern during times of personal crisis. Despite our noblest efforts, unfortunately, supervisory decisions often fail to satisfy everyone. What a surprise! Interestingly, much of the criticism of this administration comes from a small group of individuals who lack even basic supervisory experience, yet claim unlimited worldly knowledge. Matters with these individuals have deteriorated to the point of disagreement for the sake of disagreement and agreement only when there is something to be gained for personal reasons.

As most of you are aware, the union supported me during the selection process for the position of Colonel/Superintendent. Their support and the support of others helped me though the process and ultimately resulted in my appointment. Grateful for the opportunity to serve in the position of Superintendent, I thanked all who supported me. Let me be clear on this: the Union played no role in establishing my eligibility for consideration for the Colonel's position. Although appreciative for the support of many, I took this position beholden to no individual or group of individuals. To the day of my

(continued on next page)



French and Electric Blue Page 1

in this Department to allow the increasing deterioration of the respect and discipline this department is known for. These few individuals have self-elevated themselves to positions of superiority within the Department and have treated the command staff of the State Police as if we are beholden to their every request and demand.

I did not attend the recent SPAM Anniversary Party for what I feel is good reason. At the earlier stages of planning for this party, it was intended to list various attendees on the advertising poster for the event. As Colonel/Superintendent I was one of those individuals to be listed on that poster. As the event grew closer, one E-board member made an independent decision to remove me from the poster in retaliation for some decisions he did not agree with. In addition, Deputy Superintendent Hibbard did not get invited to the event. These are childish and personal attacks on individuals that represent the Massachusetts State Police. We care not to participate in such unprofessional and immature activities. But more important and disconcerting is that these few individuals being allowed to operate in this manner without question or accountability by other members. Why is this so?

Recently, as many of you are aware, several individuals were transferred from the Air Wing. This was done after a long process of trying to resolve some issues that had the potential to negatively effect the efficient and safe operation of the Air Wing. A new individual was placed in charge with the directive to take command and to identify the issues needing attention. As a result of this independent review, actions to improve the operation were taken. These actions were received positively by all of the current members of the Air Wing. I received a phone call from each and every one of the current members thanking us for our actions. I was subsequently invited to a meeting of the Air Wing, personally received their thanks again, and later received a plaque from the Air Wing signed by all of its members. I am deeply indebted to the members of the Air Wing for their support and reinforcement that the right decisions were made. The decision was not an easy one but it was the right one. We were not going to allow the safety of these officers to be compromised or allow anyone to relive the horrific tragedies of the past.

Despite overwhelming support for this action, the union did not take what some might argue is obligatory action to support a member believed to be unfairly affected. It went above and beyond. The strategy adopted by the union was to characterize the decisions as the result of an "investiga-

tion" conducted by the Department that would give them grounds to protest the transfers. The Department would be accused of not following proper procedures, thus allowing the union to attempt to overturn the decision. A high ranking union official even told me that some SPAM members at the Air Wing may have a problem if they need future representation because when they participated in rectifying some of the issues at the Air Wing they chose not to have union representation seated alongside them. Is this a veiled threat or blackmail? You decide. Who do these people really represent and where do they stand when it comes to the safety of these officers?

Over the past months, numerous external groups have made attempts to dilute the mission and responsibilities of this Department. We have worked diligently to hold our ground against moves by local law enforcement to secure statewide powers and undermine the efforts of our tactical operations teams. I am proud of the professionalism and discipline shown by our members during these trying times. Where were your representatives on these issues? Why would we not get their support when taking on these issues? At a time when the very mission of the Massachusetts State Police seems to be at risk, only words of criticism over minor internal personnel disputes were heard from these few union representatives.

This past fall we were approached by the E-Board for our assistance in solving an internal problem. SPAM members were not fully reporting their detail hours to Detail Officers when requesting detail assignments, causing an issue with the fair and equitable assignment of details. The E-Board requested the Department institute a policy that required officers to enter their detail hours on the PayStation system so that Troop Detail Officers would have an accurate account of details worked to facilitate the equitable assignment of details. Prior to this policy's implementation, it was brought to the E-Boards attention that this change would allow the Department to more closely monitor the contractually allowed 99.5 hour work week. The E-Board acknowledged this and asked that we go forward with implementation of the system. We also agreed that any officer found to be in violation of the 99.5 hour rule would be verbally warned and not formally charged. We have abided by this agreement. Supervisors have spoken to those officers found in violation and no charges have

(continued on next page)

French and Electric Blue Page 3



*The Commonwealth of Massachusetts*
*Department of State Police*

**MITT ROMNEY**
*GOVERNOR*

**KERRY HEALEY**
*LIEUTENANT GOVERNOR*

**EDWARD FLYNN**
*SECRETARY*

**COLONEL THOMAS FOLEY**
*SUPERINTENDENT*

*Division of Standards and Training*
*General Headquarters*
*470 Worcester Road*
*Framingham, Massachusetts 01701*

From:      Major Thomas R. McGilvray, Deputy Commander, Standards

To:        Trooper Jody Reilly, Division of Field Services

Date:      May 19, 2004

Subject:   Notification of Internal Investigation

1.      It is my duty to inform you that you are the subject of an official Departmental investigation.

2.      This investigation is in regards to the truthfulness of statements that you made during interviews regarding the complaint that you filed with the Harassment Investigation Unit against Lieutenant Michael Barry.  The investigation also concerns the truthfulness of entries made into your flight logbook.  The transcripts that have already been provided to you, and your flight logbook that reflects the flights from 1993 through 2001, serve as the basis for this investigation.

3.      Prior to conducting an interview with you regarding these matters, I must advise you of your rights concerning personnel investigations and call your attention to Article 27 of the current SPAM contract.

4.      You are directed to report to General Headquarters in Framingham on Friday June 18, 2004 at 1000 hours to respond to questions regarding the investigation.  If you have any questions regarding this matter, you may contact me at 508-820-2223.

*Excellence In Service Through Quality Policing*

Nov 29 05 09:58a                                                                p.3



**COLONEL THOMAS G. ROBBINS**
**SUPERINTENDENT**

*The Commonwealth of Massachusetts*
*Department of State Police*
*Office of the Superintendent*
*470 Worcester Road*
*Framingham, Massachusetts 01702*
*Telephone (508) 820-2300*

*October 21, 2005*

FROM:       Colonel Thomas G. Robbins, Superintendent

TO:         Trooper Jody A. Reilly, Motor Vehicle Regulatory Section
            Division of Field Services

SUBJECT:    Disciplinary Action as a Result of Trial Board Finding as Stated in
            Personnel Order 05PER488

1.          On September 27 and October 17, 2005 a hearing was held before a Trial Board as designated by myself pursuant to Article 6 of the State Police Rules and Regulations, relative to a complaint (2004-DST-0371) charging you with seven specifications of violation of Rule 5.27 (Truthfulness) and two specifications of violation of Rule 5.2 (Unbecoming Conduct) of the Rules and Regulations of the Massachusetts State Police.  Charges and Specifications were provided to you prior to the hearing and were part of the record before the Trial Board.

2.          At the hearing evidence was submitted which established that you were *guilty* of Charge 1, Specifications 1, 2, 3, 4, 5 and 7, violation of Rule 5.27 and further *guilty* of Charge 2, Specification 2, violation of Rule 5.2.  Evidence submitted established that you were *not guilty* of Charge 1, Specification 6, violation of Article 5.27.1 and *not guilty* of Charge 2, Specification 1, violation of Rule 5.2. You were represented by Attorney Scott Dunlap and afforded a full opportunity to be heard.

3.          In view of the evidence presented I hereby find you *guilty* of Charge 1, Specifications 1, 2, 3, 4, 5 and 7, violations of Rule 5.27 and further *guilty* of Charge 2, Specification 2, violation of Rule 5.2.  Evidence submitted established that you were *not guilty* of Charge 1, Specification 6, Article 5.27.1 and *not guilty* of Charge 2, Specification 1, violation of Rule 5.2.  Accordingly, I am ordering that you be *suspended for one year without pay* for Charge 1, Specification 1.  I order that you be suspended for one year without pay for Charge 1, Specification 2 to run concurrent with Charge 1, Specification 1.  I order that you be suspended for one year without pay for Charge 1, Specification 3 to run concurrent with Charge 1, Specification 1.  I order that you be suspended for one year without pay for Charge 1,

*Excellence In Service Through Quality Policing*

page 2

Specification 4 to run concurrent with Charge 1, Specification 1. I order that you be suspended for one year without pay for Charge 1, Specification 5 to run concurrent with Charge 1, Specification 1. I order that you be suspended for thirty (30) days without pay for Charge 1, Specification 7 to run concurrent with Charge 1, Specification 1. I order that you be *suspended for an additional thirty (30) days without pay* for Charge 2, Specification 2 to run consecutive with Charge 1, Specification 1.

4.        You may appeal this decision to the Civil Service Commission within ten (10) days of receipt of this letter.

Thomas G. Robbins
Superintendent/Colonel
Massachusetts State Police

Nov 29 05 09:59a                                                    p.8




*The Commonwealth of Massachusetts*
*Department of State Police*

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**EDWARD A. FLYNN**
SECRETARY

**COLONEL THOMAS G. ROBBINS**
SUPERINTENDENT


RECEIVED
OCT 2 [  ] 2[ ]
OFFICE OF THE SUPERINTENDENT
MASS STATE POLICE


RECEIVED
OCT 21 2005
DIVISION OF STANDARDS
AND TRAINING

October 21, 2005

To:       Colonel Thomas G. Robbins, Superintendent
From:     Major Mark F. Delaney, President, Special Board
          Captain Kevin J. Butler, Secretary, Special Board
          Lieutenant Maryann Dill, Member, Special Board

Subject:  Findings and Recommendations of the Trial Board Appointed in
Personnel Order 05PER384. Trooper Jody A. Reilly, Division of Field Services.

1.      On 09/27/05, and 10/17/05, and 10/18/05, the Special Board appointed on
Personnel Order 05PER384 convened at State Police Headquarters in Framingham. As a
result of this hearing, and after deliberations, the Board, pursuant to unanimous vote,
made the following findings:

| | |
|---|---|
| Charge 1, Specification 1 | Guilty |
| Charge 1, Specification 2 | Guilty |
| Charge 1, Specification 3 | Guilty |
| Charge 1, Specification 4 | Guilty |
| Charge 1, Specification 5 | Guilty |
| Charge 1, Specification 6 | Not Guilty |
| Charge 1, Specification 7 | Guilty |
| | |
| Charge 2, Specification 1 | Not Guilty |
| Charge 2, Specification 2 | Guilty |

2.      **Charge 1**- violations of Article 5.27 of the Rules and Regulations for the
governance of the Department of State Police to wit: **Truthfulness.**

Specification 1- In that Trooper Jody Reilly #2443 of the Massachusetts State
Police, Division of Field Services, did on June 23, 2003, provide an untruthful response
during an official Departmental investigation, knowing same to be untruthful. This
occurred when, during an official Departmental investigation, Trooper Reilly untruthfully
responded "No" when asked whether she had ever been involved romantically, or had

*Excellence In Service Through Quality Policing*

been in a dating relationship, with the previous Commander of the Airwing, Lieutenant Michael Melia (1-157-2). On April 12, 2004, Trooper Reilly was again interviewed regarding this issue. She stated that she had been in an intimate dating relationship with Lieutenant Melia from July of 2001 to the date of this interview. This is a direct violation of Article 5.27.2. Based on the admissions of the defendant, a finding of guilty is made to Charge 1, Specification 1.

Specification 2- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on June 23, 2003, provide an untruthful response during an official Departmental investigation, knowing same to be untruthful. This occurred when, during an official Departmental investigation, Trooper Reilly untruthfully responded "No" when asked whether she had ever, with the exception of job related activities, socialized with the previous Commander of the Airwing, Lieutenant Michael Melia (1-158-5). On April 12, 2004, Trooper Reilly was again interviewed regarding this issue. She stated that she had been in an intimate dating relationship with Lieutenant Melia from July of 2001 to the date of this interview. This action is a direct violation of Article 5.27.2. Based on the admissions of the defendant, a finding of guilty is made to Charge 1, Specification 2.

Specification 3- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on June 23, 2003, provide an untruthful response during an official Departmental investigation, knowing same to be untruthful. This occurred when, during an official Departmental investigation, Trooper Reilly untruthfully responded "No" when asked whether she had ever been to Lieutenant Michael Melia's house or whether he had ever been to her house. (1-159-17). On April 12, 2004, Trooper Reilly was again interviewed regarding this issue. Trooper Reilly stated that she had been in an intimate dating relationship with Lieutenant Melia from July 2001 to the date if this interview. She stated that Lieutenant Melia resided with her, at least on a part time basis, since October of 2001. This action is in direct violation of Article 5.27.2. Based on the admissions of the defendant, a finding of guilty is made to Charge 1, Specification 3.

Specification 4- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on April 12, 2004, provide an untruthful response during an official Departmental investigation, knowing same to be untruthful. This occurred when, during an official Departmental investigation, Trooper Reilly was asked when her dating relationship with Lieutenant Michael Melia began and she untruthfully responded "After he retired". (2-85-16). The interview continued and Trooper Reilly was again questioned regarding this issue. Trooper Reilly stated that she had been in an intimate dating relationship with Lieutenant Melia from July of 2001 to the date of this interview. This is a direct violation of Article 5.27.2. Based on the admissions of the defendant, a finding of guilty is made to Charge 1, Specification 4.

Specification 5- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on April 12, 2004, provide an untruthful response during an official Departmental investigation, knowing same to be untruthful. This occurred when, during an official Departmental investigation, Trooper Reilly was asked

2

when did she start her dating relationship with Lieutenant Melia and she untruthfully responded "After he retired". (2-90-2). The interview continued and Trooper Reilly was again questioned regarding this issue. Trooper Reilly stated that she had been in an intimate dating relationship with Lieutenant Melia from July of 2001 to the date of this interview. Lieutenant Melia retired in July of 2002. This action is a direct violation of Article 5.27.2. Based on the admissions of the defendant, a finding of guilty is made to Charge 1, Specification 5.

Specification 6- In that Trooper Jody Reilly #2443 of the Massachusetts State police, Division of Field Services, did on September 10, 2001, provide an examiner of the Federal Aviation Authority a flight logbook purporting the document to be accurate but knowing that it contained inaccurate information regarding her actual flight experience. This inaccurate information concerned flights recorded as being flown on October 16, 17 and 18, 1998. The testimony offered at trial was insufficient to convince the board that Trooper Reilly knew that the logbook contained inaccurate information at the time that it was provided to the Federal Aviation Authority. The board therefore finds Trooper Reilly Not Guilty of Charge 1, Specification 6.

Specification 7- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on September 10, 2001, provide an examiner of the Federal Aviation Authority a flight logbook purporting the document to be accurate but knowing that it contained inaccurate information regarding her actual flight experience. This inaccurate information concerned flights recorded as being flown on May 30. 2001. The flight log book indicates a solo flight with three legs between Massachusetts and New York. Trooper Reilly admitted that she was not flying solo, nor was she present on board during one leg of the flight. The log book credits her with a solo flight and a total flight time including the leg where she was not on the aircraft. This action is in direct violation of Article 5.27.1. Based on the log book entries, and admissions on her part that she made inaccurate entries, a finding of guilty is made to Charge 1, Specification 7.

3.    **Charge 2-** violations of Article 5.2 of the Rules and Regulations for the governance of the Department of State Police to wit: **Unbecoming Conduct.**

Specification 1- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on September 10, 2001, provide an examiner of the Federal Aviation Authority a flight logbook purporting the document to be accurate but knowing that it contained inaccurate information regarding her actual flight experience. This inaccurate information concerned flights recorded as being flown on October 16, 17 and 18, 1998. This action brought the Massachusetts State Police into disrepute and reflected discredit upon Trooper Reilly as a member of the Massachusetts State Police. The testimony at trial was insufficient to convince the board that Trooper Reilly knew that the log book contained inaccurate information at the time it was provided to the Federal Aviation Authority. The Board therefore finds the defendant Not Guilty of Charge 2, Specification 1.

Specification 2- In that Trooper Jody Reilly #2443 of the Massachusetts State Police, Division of Field Services, did on September 10, 2001, provide an examiner of the federal Aviation Authority a flight logbook purporting the document to be accurate but knowing it contained inaccurate information regarding her actual flight experience. This inaccurate information concerned flights recorded as being flown on May 30, 2001. This action brought the Massachusetts State Police into disrepute and reflected discredit upon Trooper Reilly as a member of the Massachusetts State Police. The flight logbook indicates a solo flight with three legs between Massachusetts and New York. Evidence indicates that Trooper Reilly was not flying solo, nor was she present on board during one leg of the flight. The flight logbook credits her with a solo flight and a total flight time including the leg where she was not present on the aircraft. This deceptive action diminished the reputation of Trooper Reilly and the State Police Airwing. This is a direct violation of Article 5.2. Based on the log entries and an admission on her part that she had made entries in error, a finding of guilty is made to Charge 2, Specification 2.

3.    This board feels that accurate and truthful statements by members of the State Police are paramount to the integrity of the organization and a founding principle of the law enforcement profession. There is nowhere in our organization where integrity, accurate documentation, and competency are more important and necessary than as a pilot in the Massachusetts State Police. The absolute safety of the pilot and crew, passengers, and the general public rightfully depends on these very core principles. It is with these premises in mind and upon a review of Trooper Jody Reilly's employment history that the Board respectfully recommends that disciplinary action be taken against Trooper Reilly in the form of suspension without pay for a period of 13 months.

Charge 1, Specification 1- (1 year) suspension without pay

Charge 1, Specification 2- (1 year) suspension without pay **concurrent** with Charge 1, Specification 1.

Charge 1, Specification 3- (1 year) suspension without pay **concurrent** with Charge 1, Specification 1.

Charge 1, Specification 4- (1 year) suspension without pay **concurrent** with Charge 1, Specification 1.

Charge 1, Specification 5- (1 year) suspension without pay **concurrent** with Charge 1, Specification 1.

Charge 1, Specification 7- (30 days) suspension without pay **concurrent** with Charge 1, Specification 1.

Charge 2, Specification 2- (30 days) suspension without pay to serve **consecutive** to Charge 1, Specification 1.

4

Further, it is the order of this Board that Trooper Reilly be prohibited from operating of any Massachusetts State Police aircraft in the future.

Respectfully submitted,

Major Mark F. Delaney

Captain Kevin J. Butler

Lieutenant Maryann Dill

APPROVED
OCT 2 1 2005
EXECUTIVE OFFICE

5